No. 89-422

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

       Plaintiff and Respondent,

-vs-

BETTY ANN CURTIS,

       Defendant and Appellant.



FILED

FEB 9 - 1990

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Ravalli,
The Honorable Jeffrey Sherlock, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James A. Haynes, Hamilton, Montana

    For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
        Elizabeth S. Baker, Asst. Atty. General, Helena
        John W. Robinson, County Attorney, Hamilton, Montana

Submitted on Briefs: Dec. 1, 1989

Decided: February 9, 1990

Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

A jury in the Fourth Judicial District, Ravalli County, found Betty Ann Curtis guilty of felony theft from a checking account and of a certificate of deposit belonging to an elderly patient under her care. She now appeals on grounds of excessive pre-indictment delay, lack of speedy trial, and refusal of a directed verdict. We affirm.

## ISSUES

1. Did a 422-day delay between completion of the crime and the filing of the criminal complaint violate the defendant's right to due process?

2. Did a 291-day delay between the filing of the criminal complaint and the beginning of trial violate the defendant's right to a speedy trial?

3. Was the evidence following the State's case-in-chief sufficient to refuse the defendant's motion for a directed verdict on Count IV, theft of a certificate of deposit?

## FACTS

Octogenarian Dorothy Bullock lived alone in his life-long home of Hamilton, Montana. His niece, Carol Curry, lived in Whitefish, Montana. She did not maintain a close relationship with her uncle, but held a power of attorney enabling her to supervise his financial affairs.

2

In November of 1985 Bullock hired a licensed practical nurse, Betty Curtis, to help with his daily affairs. Bullock paid Curtis between $800 and $1000 per month to cook, clean, wash clothes, buy groceries, and run errands. Two months after hiring Curtis, Bullock had his attorney draw up a will appointing Curtis his personal representative, and, among other dispositions, leaving Curtis his home in Hamilton. In April of 1986, he provided Curtis with a power of attorney giving her access to his safety deposit box and bank accounts.

In the spring of 1987, Carol Curry became suspicious when she noticed a dramatic change in Bullock's banking activities. On April 20, 1987, she asked the Ravalli County sheriff's office to investigate, and they confirmed Curry's suspicions. In March 1986, Bullock's check-writing increased from an average of five to seven checks per month to twenty to thirty checks per month. Many of those checks went to Curtis and her sons. Between March of 1986 and April of 1987, Curtis received 161 checks totaling $34,540, an average of $2,467 per month. Curtis's son Todd received $2,760 and her son Barry received $1,500 from Bullock's checking account.

Investigating officers also discovered the loss of a $20,000 certificate of deposit held jointly by Bullock and his brother Clarence. On the morning of March 17, 1987, Bullock and Curtis took the certificate from Bullock's safety deposit box, cashed it, and purchased a new certificate held jointly by Bullock and Curtis.

One week later the certificate was cashed for $19,931.46. Of the proceeds, $6,700 was deposited in the account of Curtis's son Kyp and used to satisfy a judgment to repossess the appellant's car. Seven thousand dollars was deposited in Curtis's bank account and the remaining $6,231.46 was taken in cash. The next week, $6,231.46 was deposited in a joint checking account in the names of Betty and Kyp Curtis.

On June 2, 1988, a complaint was filed against the appellant charging four counts of felony theft. The trial commenced on March 20, 1989. The District Court ruled that Bullock was not competent to testify on substantive issues. The jury found Curtis guilty on two counts; one of theft from Bullock's checking account and another of the theft of the certificate of deposit. Curtis now appeals her conviction.

## DISCUSSION

In her accusations of pre-indictment delay and lack of speedy trial, the appellant presents a difficult and close question. The length of delays from investigation to accusation and from accusation to trial approach the tolerable constitutional limits. The exclusion of the victim as a potentially exculpatory witness raises the possibility of great prejudice against the defense. Because of these concerns, we set out our analysis in commensurate detail.

We begin by noting that the appellant has lumped together arguments on lack of a speedy trial and arguments on excessive pre-indictment delay. The United States Supreme Court utilizes different standards for each of these issues. Speedy trial is guaranteed by the Sixth Amendment of the United States Constitution and is analyzed according to the standards set out in Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117. Freedom from excessive pre-indictment delay is guaranteed by the statutes of limitations and the Fifth and Sixth Amendments. It is analyzed according to the standards set out in United States v. Marion (1971), 404 U.S. 307, 323-24, 92 S.Ct. 455, 465, 30 L.Ed.2d 468, 480-81. These rights act in a complimentary fashion to protect the criminal defendant from unreasonable delay from the time when investigation begins to the time when trial commences. The statute of limitations and due process cover from the time when the investigation begins to the point at which the defendant is accused, whereas the speedy trial guarantee covers from the accusation to the time when trial begins. United States v. Lovasco (1977), 431 U.S. 783, 788-89, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752, 758. This Court utilizes the same analysis. State v. Bartnes (Mont. 1988), 764 P.2d 1271, 1273-74, 45 St.Rep. 2101, 2103; State v. Goltz (1982), 197 Mont. 361, 365-66, 642 P.2d 1079, 1081-82; State v. Burchett (1974), 165 Mont. 280, 283, 530 P.2d

471, 473, cert. den. 448 U.S. 914, 95 S.Ct. 1397, 43 L.Ed.2d 654 (1975).

## PRE-INDICTMENT DELAY

Under the due process analysis, the defendant has the burden of proving whether the State intentionally delayed charging the defendant to gain a tactical advantage and whether any delay caused actual prejudice to the conduct of the defense. Marion, 404 U.S. at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 481; Bartnes, 764 P.2d at 1274, 45 St.Rep. at 2013. We need not decide in this case whether the appellant must prove both intentional delay and actual prejudice since she does not claim the former and fails to sufficiently prove the latter. See Goltz, 197 Mont. at 367, 642 P.2d at 1082.

### Prejudice to the Defense

The appellant argues that the 422-day delay between the final date of the commission of the offenses, April 30, 1987, and the date the complaint was filed, June 2, 1988, violated her due process rights. She asserts that the delay prejudiced her defense because during that time Bullock's mental condition deteriorated leaving him unable to exonerate the defendant. According to the appellant, if the trial had been held earlier, Bullock's memory would have been intact and he would have testified that he freely gifted the money in question to Curtis and her children. The appellant points to testimony given by various witnesses indicating

6

that Bullock was sharp, alert, and competent in January, April, May, and September of 1987. By the time trial began on March 23, 1989, however, Bullock's memory of the events had deteriorated to the point where the trial court adjudged him incompetent to testify.

Prejudice to the defense is the primary consideration in pre-indictment delay. "[T]he inability of a defendant adequately to prepare his case skews the fairness of the entire system." Barker, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. In particular, the loss of a witness's ability to recall disputed events can seriously impair the defense. See Barker, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118; State v. Larson (1981), 191 Mont. 257, 264, 623 P.2d 954, 959. In this case, however, the record contains considerable evidence which discredits the appellant's claim of prejudice due to Bullock's loss of memory.

First, during the trial, the defense presented much of the evidence to which Curtis alleges Bullock would have testified. As noted by the appellant, a number of witnesses testified on Bullock's ability to handle his financial affairs during the time of the disputed transactions. The defense also presented testimony given by Bullock during a competency hearing in June of 1987. In that testimony, Bullock stated that he was aware of his financial condition and that Curtis wrote the checks and signed the certificate of deposit with his approval. The defense introduced an

7

affidavit signed by Bullock on May 14, 1987, to the same effect.

> That in consideration of [Betty Ann Curtis's] having cared for me and assisted me in all of my personal affairs for several years, I have given her money and other items which are intended to be wages and gifts for the many kindnesses shown me.

We recognize that second-hand evidence cannot have the same impact on a jury as a statement of exoneration by the purported victim of the crime. The defense, however, was not precluded from presenting the essential facts supporting its theory.

Second, even if the trial had been held at an earlier date, the appellant has not shown that the court would have allowed Bullock to testify. Following the June 1987 competency hearing, the court held that Bullock was not competent to manage his financial and personal affairs and appointed Curry as his permanent guardian. While the standard of competency to manage one's affairs, §§ 72-5-316(1), -409(2)(b), MCA, is not identical to the standard of competency to testify, State v. Coleman (1978), 177 Mont. 1, 27, 579 P.2d 732, 748, cert. den. 448 U.S. 914, 101 S.Ct. 34, 65 L.Ed.2d 1177 (1980), the evidence indicates that Bullock may not have been competent to testify as early as June 1987 when the investigation began.

Third, the appellant has not shown that even if allowed to testify, Bullock would have testified for the defense. The record indicates that Bullock changed his allegiance several times.

8

Before hiring Curtis, Bullock trusted his niece with a power of attorney and supervision of his bank accounts. After Curtis became a constant presence in his life, Bullock began to favor her over Curry. In January of 1986, he signed a will devising his house to Curtis and appointing Curtis as personal representative. In April of 1986, he gave Curtis a power of attorney over his checking account. When Curry discovered the depletion of Bullock's account in the spring of 1987, she began court proceedings to gain full guardianship over Bullock. On learning of the guardianship proceedings in May, Bullock turned fully against his niece. He gave Curtis a general power of attorney, revoked Curry's power of attorney, rewrote his will to delete a previous devise to Curry, and wrote the above-mentioned affidavit stating that the transactions were gifts. In July of 1987, Curtis lost her position caring for Bullock and her influence over him ended. By September he had revised his opinion of her. Bullock wrote a new will deleting his devise to Curtis, replacing her with Curry as his personal representative, and reinstating his former devise to Curry.

From this scenario, it is apparent that Bullock remained loyal to Curtis only during the period in which she exerted constant influence over his life. Even if the trial had been held, and Bullock allowed to testify, as early as September of 1987, Bullock might just as well have been the State's star witness testifying about the influence Curtis exerted over him.

The appellant's concern about the loss of Bullock's testimony is undermined by her failure to depose Bullock until thirty days prior to trial. See State v. Shurtliff (1980), 187 Mont. 235, 241, 609 P.2d 303, 306. If Bullock's memory was deteriorating, and if his testimony was essential to the defense, the appellant could have preserved Bullock's exculpatory testimony by taking his deposition at any time after charges were filed in July of 1988. Indeed, the exclusion of Bullock may have given the appellant the best defense possible. She presented evidence of Bullock's early exculpatory statements without running the risk of adverse testimony after Bullock changed his opinion of Curtis.

Fourth, the issue of prejudice is a question of fact which the District Court decided on two different occasions. Six weeks before trial, the District Court denied the appellant's motion to dismiss for lack of a speedy trial. The court considered Bullock's mental condition and found no prejudice to the appellant's defense caused by delay in commencing trial. As the appellant notes, the District Court apparently accepted the State's contention that Bullock's mental condition had not deteriorated but had actually improved between the beginning of the investigation and the approaching trial date. Ten days before trial, the court rejected the appellant's renewed motion to dismiss. The court again considered Bullock's mental condition and found no change from the summer of 1988. Although Curtis has not specifically appealed the

10

District Court's rulings on the motions to dismiss, we give substantial weight to the District Court's determinations of a witness's competency. Coleman, 177 Mont. at 27, 579 P.2d at 748.

Finally, the appellant is required to show that the purported prejudice is more than mere speculation. Goltz, 197 Mont. at 367, 642 P.2d at 1082. Here, the foregoing indicates that the appellant's argument is not based on what Bullock would have said at trial; it is based on what the appellant desired Bullock to say at trial. We conclude that the appellant has failed in her burden of proving sufficient prejudice to the defense.

## Investigative Delay

Even if some prejudice had been proven in this case, that prejudice must outweigh the necessity of allowing a reasonable time to investigate the crime. Goltz, 197 Mont. at 368-69, 642 P.2d at 1083. In United States v. Lovasco, the United States Supreme Court recognized that reasonable investigative delay protects the interests of both the State and the defendant. From the potential defendant's perspective, premature indictment would,

> increase the likelihood of unwarranted charges being filed, and would add to the time during which the defendants stand accused but untried. These costs are by no means insubstantial since . . . a formal accusation may interfere with the defendant's liberty, disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

11

<u>Lovasco</u>, 431 U.S. at 791, 97 S.Ct. at 2049, 52 L.Ed.2d at 760. (Citations, quotations and footnote deleted.) From the State's perspective, premature indictment could impair investigations by causing sources of information to dry up and by alerting other potential defendants of the possibility of indictment. The threat of dismissal for failure to prosecute would pressure the State into early and potentially ill-considered and unwarranted prosecutions thereby increasing the burden on the judicial system. <u>Lovasco</u>, 431 U.S. at 791-94, 97 S.Ct. at 2049-51, 52 L.Ed.2d at 760-62.

The record in the present case contains no evidence concerning the prosecution's reasons for the long delay in indictment. We have before us only the State's unsubstantiated assurance that, "The investigation covered a period of more than one year and required delving into numerous bank records involving accounts belonging to four different individuals." Against this, the appellant offers nothing to show that the delay was not reasonable and necessary in relation to the complexity of the investigation.

In <u>Lovasco</u>, the United States Supreme Court faced a similar situation. In holding for the government, the Court explicitly relied on reasons for the prosecution's delay given in the government's briefs and oral arguments. <u>Lovasco</u>, 431 U.S. at 796, 97 S.Ct. at 2052, 52 L.Ed.2d at 763. Like the Supreme Court, Ciucci v. Illinois (1958), 356 U.S. 571, 573, 78 S.Ct. 839, 840, 2 L.Ed.2d 983, 985, we generally will not accept unsubstantiated evidence

presented only in the parties' briefs, State v. Tiedemann (1978), 178 Mont. 394, 397, 584 P.2d 1284, 1287. Reasons for investigative delay, however, are not normally trial issues and may not produce an evidentiary record. Furthermore, in this case, the appellant has offered no evidence to counter the State's contention. Therefore, in this case, we follow the Supreme Court in assuming that the prosecution's statements were rendered in good faith.

We hold that the complexity of the evidence warranted the length of the investigative period. The requirements of a conscientious investigation outweighed the prejudice, if any, which may have occurred. The pre-indictment delay did not violate the appellant's right to due process.

## SPEEDY TRIAL

At the start, we set out the basic parameters of the speedy trial analysis under the Sixth Amendment. The inquiry centers on four factors: (1) the length of the delay, (2) the reason for the delay, (3) the assertion of the right by the defendant, and (4) the prejudice to the defense. Barker, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; Briceno v. District Court (1977), 173 Mont. 516, 518, 568 P.2d 162, 163-64.

### Length of the Delay

The first element is of primary importance in triggering the remainder of the analysis. The court need not go beyond the first element unless the delay is presumptively prejudicial. Barker, 407

13

U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; State v. Wiman (Mont. 1989), 769 P.2d 1200, 1202, 46 St.Rep. 279, 283. If the court finds the delay to be presumptively prejudicial, the State has the burden of rebutting the presumption by providing a reasonable explanation for the delay and showing that the defendant was not prejudiced. State v. Wombolt (Mont. 1988), 753 P.2d 330, 331, 45 St.Rep. 714, 716.

Here the complaint was filed on June 2, 1988, and trial commenced on March 20, 1989, creating a delay of 291 days. The parties' briefs exhibit some confusion concerning at what point delay attributable to the defendant should be considered. Some confusion is not surprising considering the recent case law. Some cases deducted time attributable to the defendant before determining whether the delay was long enough to establish a presumption of prejudice.[1] Other cases did not consider such delay until after the presumption of prejudice had been established and dealt with it under the second analytical element, the reasons for the delay.[2]

_____

[1] See e.g. State v. Wiman (Mont. 1989), 769 P.2d 1200, 1202, 46 St.Rep. 279, 283; State v. Forsyth (Mont. 1988), 761 P.2d 363, 369, 45 St.Rep. 1577, 1581; State v. Kerns (1986), 223 Mont. 172, 174, 725 P.2d 1190, 1191; State v. Robbins (1985), 218 Mont. 107, 117, 708 P.2d 227, 234; State v. Britton (1984), 213 Mont. 155, 161, 689 P.2d 1256, 1260; State v. Kelly (1983), 203 Mont. 159, 161, 661 P.2d 26, 27.

[2] See e.g. State v. Morris (1988), 230 Mont. 311, 315, 749 P.2d 1379, 1381; State v. Tilly (1987), 227 Mont. 138, 140-41, 737 P.2d 484, 486; State v. Palmer (1986), 223 Mont. 25, 28, 723 P.2d 956, 958; State v. Chavez (1984), 213 Mont. 434, 441-42, 691 P.2d

We believe that the second procedure is more appropriate.[3] The length of delay is considered twice in speedy trial analysis. In the first instance, it acts merely as a trigger to determine whether further inquiry is warranted. If further inquiry is warranted, the length of the delay is again considered as an inextricable component of the second element, the reasons for the delay. See Barker, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; United States v. Colombo (1st Cir. 1988), 852 F.2d 19, 24.

The primary purpose of the length of delay as a trigger is to provide the courts and the parties with a rudimentary warning of when speedy trial problems may arise. When a defendant alleges a

1365, 1370; State v. Ackley (1982), 201 Mont. 252, 256, 653 P.2d 851, 853; State v. Larson (1981), 191 Mont. 257, 262, 623 P.2d 954, 958; State v. Shurtliff (1980), 187 Mont. 235, 239-40, 609 P.2d 303, 305-06.

[3] This procedure is utilized by the majority of federal circuit courts. The circuit courts near universally look only to the unallocated length of the delay in determining whether a presumption of prejudice has arisen. They credit delays to the defense and the prosecution only after finding that such a presumption exists. See United States v. Colombo (1st Cir. 1988), 852 F.2d 19, 24; United States v. Richards (8th Cir. 1983), 707 F.2d 995, 997; United States v. Varella (11th Cir. 1982), 692 F.2d 1352, 1359, cert. den. 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983); Cain v. Smith (6th Cir. 1982), 686 F.2d 374, 381; United States v. Nance (9th Cir.) 666 F.2d 353, 360, cert. den. 456 U.S. 918, 102 S.Ct. 1776, 72 L.Ed.2d 179 (1982); United States v. Greene (5th Cir. 1978), 578 F.2d 648, 655, cert. den. 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979); United States v. Calloway (D.C. Cir. 1974), 505 F.2d 311, 316; but see United States v. Strayf (11th Cir. 1983), 701 F.2d 875, 878-79; Ricon v. Garrison (4th Cir.), 517 F.2d 628, 632-33, cert. den. 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127 (1975).

speedy trial violation, the length of the delay acts as a rough measure of whether further inquiry is warranted. Incorporating into that element arguments over how much delay the State caused and how much the defendant caused would complicate the measure and thereby dilute its usefulness.

This procedure does not signify a precise quantification of the triggering time. An overly-specific measure is objectionable for several reasons. First, the tolerable time for bringing a case to trial may vary over the years for practical and policy reasons. We have recognized that as a matter of policy the length of acceptable delay should be gradually shortened. Wombolt, 753 P.2d at 331-32, 45 St.Rep. at 716-17; State v. Chavez (1984), 213 Mont. 434, 442, 691 P.2d 1365, 1370; State v. Fife (Mont. 1981), 632 P.2d 712, 714, 38 St.Rep. 1334, 1336. Against such policy considerations we must weigh the reality of an often overburdened court system. The goal of the speedy trial guarantee is not simply speed; it is the orderly disposition of criminal proceedings while preventing oppressive tactics by the prosecution. United States v. Marion (1971), 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468, 474; Wiman, 769 P.2d at 1201, 46 St.Rep. at 281.

Second, the facts of the individual case may warrant a longer than usual delay. The United States Supreme Court has stated that the complexity of the case may be a factor in determining whether a delay should trigger further analysis:

16

> [T]he length of delay that will provoke . . .
> an inquiry is necessarily dependent upon the
> peculiar circumstances of the case. To take
> but one example, the delay that can be tolera-
> ted for an ordinary street crime is con-
> siderably less than for a serious, complex
> conspiracy charge.

Barker, 407 U.S. at 530-31, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. See also Chavez, 213 Mont. at 441, 691 P.2d at 1369; Cain v. Smith (6th Cir. 1982), 686 F.2d 374, 381; State v. Worden (1980), 188 Mont. 94, 96-97, 611 P.2d 185, 186. This Court has not yet found a case so complex as to warrant an exceptional delay without triggering a presumption of prejudice. However, in unusual circumstances, complexity may become a factor.

Finally, if the defendant actively avoids trial, speedy trial analysis may not be warranted regardless of the length of the delay. State v. Wirtala (Mont. 1988), 752 P.2d 177, 180, 45 St.Rep. 596, 599.

One apparent exception to the procedure here adopted arises in cases in which the defendant has been accused, but the prosecution is procedurally barred from proceeding to trial. In United States v. Loud Hawk the United States Supreme Court held that a seven-year delay during the prosecution's appeal of dismissed indictments was excluded from the defendants' speedy trial claim. Loud Hawk (1986), 474 U.S. 302, 312, 106 S.Ct. 648, 654, 88 L.Ed.2d 640, 652. Similarly, in State v. Armstrong this Court held that a three-year stay pending a habeas corpus petition should not be

17

counted. <u>Armstrong</u> (1980), 189 Mont. 407, 424-25, 616 P.2d 341, 351. Such delays are not specifically attributable to the defendants; they are, more properly, time during which the speedy trial clock does not run and should not count toward triggering a presumption of prejudice.

In the case sub judice, the delay of 291 days is sufficient to raise a presumption of prejudice and require further inquiry. See State v. Palmer (1986), 223 Mont. 25, 27-28, 723 P.2d 956, 958 (256 days). The State now has the burden of providing a reasonable explanation for the delay and to show that the defendant was not prejudiced by the delay. <u>Wombolt</u>, 753 P.2d at 331, 45 St.Rep. at 716.

### Reasons for the Delay

The parties agree that fourteen days of the delay are attributable to the appellant. The appellant produced a seven-day delay by asking for a continuance of the arraignment from August 10 to August 17, 1988. At the arraignment the appellant requested a substitution of District Court Judge James B. Wheelis. On August 24, 1988, District Court Judge Gordon R. Bennett assumed jurisdiction producing another seven-day delay attributable to the appellant.

The State also asserts that the ten days between January 31, 1989, when the defendant filed its first motion to dismiss, and February 10, 1989, when the District Court refused the motion,

18

should be charged against the appellant. The State relies on State v. Kerns in which this Court excluded the period during which the defendant's motion to dismiss was pending. Kerns (1986), 223 Mont. 172, 174, 725 P.2d 1190, 1191.

Kerns is distinguishable from the present case. In Kerns the District Court delayed the omnibus hearing and setting of the trial date until after it had ruled on the defendant's motion to dismiss. Here, the District Court considered and decided Curtis's motion to dismiss after setting the proposed trial date. On January 27, 1989, the District Court set the trial date for February 27. The appellant moved to dismiss on January 31 and the court decided the issue on February 10. Since the entire issue was settled within the pre-established trial schedule, it caused no delay and is not chargeable against the appellant. See State v. Pease (1987), 227 Mont. 424, 428-29, 740 P.2d 659, 662.

The appellant is, however, properly credited with a twenty-five-day delay caused by another defense motion. The District Court granted the appellant's uncontested motion to continue the trial date from February 23 to March 20, 1989. While the appellant correctly points out that the State used this period to continue trial preparations, the appellant fails to show that the State could not have proceeded to trial without it. The continuance, therefore, falls entirely on the appellant. Of the entire 291 days

from accusation to trial, thirty-nine days are attributable to the appellant and the State must explain the remaining 252 days.

The retirement of Judge Bennett at the end of December 1988 caused some of this delay. His replacement, District Court Judge Jeffrey Sherlock, held the omnibus hearing and set the trial date on February 27, 1989. Such delays are institutional. State v. Ackley (1982), 201 Mont. 252, 256, 653 P.2d 851, 853 (delay caused by election of new judge held institutional). The State provides no explanation for the remaining time except that both parties were involved in trial preparation up to the time of trial. We therefore concluded that the State is chargeable with 252 days of institutional delay. Such delays are weighed against the State, but not as heavily as delays resulting from oppressive tactics. Chavez, 213 Mont. at 442, 691 P.2d at 1370. Although this delay is unusually long, delay is not in itself sufficient to establish a speedy trial violation. State v. Waters (1987), 228 Mont. 490, 492, 743 P.2d 617, 619. Against this delay, we must balance the other Barker factors.

## Assertion of the Right

The State concedes that the appellant satisfied the third element by moving to dismiss on speedy trial grounds on January 31, 1989, and again on March 10, 1989.

## Prejudice to the Defendant

In considering the final factor in the analysis, the court must look to the interests protected by the right to speedy trial: (1) to prevent oppressive pre-trial incarceration; (2) to minimize the defendant's anxiety and concern; (3) to limit the impairment of the defense. Barker, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118; State v. Morris (1988), 230 Mont. 311, 316, 749 P.2d 1379, 1382.

The first interest carries no weight in this case because Curtis was never incarcerated. See Morris, 230 Mont. at 316, 749 P.2d at 1382.

As to the second interest, Curtis argues that she suffered anxiety from her loss of employment. The appellant points to a letter discharging her from employment with the Ravalli County Public Health Nursing Service shortly after the investigation began. Curtis also notes that the presentence report documents the loss of her Licensed Practical Nurse status and employment with the Valley View Nursing Home as a result of her conviction.[4]

The District Court found no serious allegation or proof of anxiety and we agree. The dismissal letter shows that Curtis lost her employment with Ravalli County, but not why she lost it. The

---

[4] We note that the appellant deprived the State of an opportunity to respond to evidence based on the presentence report by referring to it for the first time in the appellant's reply brief.

21

presentence report indicates that she was able to work at her normal occupation at Valley View, though perhaps not for her chosen employer, up until the time of conviction. Her continued employment should have mitigated any anxiety Curtis suffered.

The existence of anxiety or emotional distress is notoriously difficult to prove. The State is faced with the near impossible burden of proving that it does not exist. We have recognized that, "The State's burden to show a lack of prejudice becomes considerably lighter in the absence of evidence of prejudice to the appellant." Ackley, 201 Mont. at 258, 653 P.2d at 854. It necessarily follows that the State's burden to show a lack of anxiety becomes considerably lighter in the absence of more than marginal evidence of anxiety.

Even if Curtis had presented some evidence of anxiety, the anxiety she suffered was not uncommon. "A certain amount of anxiety and concern is inherent in being accused of a crime." Waters, 228 Mont. at 494, 743 P.2d at 620. When a defendant is accused and then convicted of taking advantage of a position of care and trust, she should expect to lose that position and its requisite licensed privileges. As to this interest, we must conclude that it does not weigh heavily against the State.

We have already determined under the pre-indictment delay issue that the defense suffered little if any prejudice. The present analysis differs only in that the burden is on the State

to prove a lack of prejudice. Based on our previous analysis of prejudice to the defense, we hold that the State has adequately met its burden.

## Conclusion

We must consider the four speedy trial factors collectively and in relation to the circumstances of the particular case; no one factor is either necessary or sufficient to establish a deprivation of the right. Barker, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118; Wombolt, 753 P.2d at 331, 45 St.Rep. at 716. The time required to bring this case to trial was longer than would normally be expected and the State offers no adequate explanation other than institutional delay. The State has, however, shown that the appellant suffered little more anxiety than would normally be expected. Finally, and most importantly, the appellant's contention that the loss of Bullock as a witness prejudiced the defense is based primarily on speculation not supported by the record. Taking all of these factors together, we hold that the State did not violate appellant's right to a speedy trial.

## DIRECTED VERDICT

Following the State's case-in-chief, the appellant moved for a directed verdict on all counts. The District Court denied the motion and the jury found Curtis guilty on Count One, theft from Bullock's Citizens State Bank checking account, and Count Four, theft of Bullock's Ravalli County Bank certificate of deposit.

23

The decision to grant or deny a directed verdict at the close of the prosecution's case-in-chief is within the discretion of the trial court. The trial court may exercise that discretion to acquit the defendant only when the State presented no evidence upon which a jury could base a guilty verdict. State v. Miller (Mont. 1988), 757 P.2d 1275, 1282, 45 St.Rep. 790, 798. In our review of the trial court's decision,

> the relevant question is whether after review-
> ing the evidence in the light most favorable
> to the prosecution, any rational trier of fact
> could have found the essential elements of the
> crime beyond a reasonable doubt.

Miller, 757 P.2d at 1282, 45 St.Rep. at 798.

The statute cited in Count Four states:

> (2) A person commits the offense of theft when
> he purposely or knowingly obtains by threat or
> deception control over property of the owner
> and:
>
> . . .
>
> (b) purposely or knowingly uses, conceals, or
> abandons the property in such manner as to
> deprive the owner of the property . . . .

Section 45-6-301(2)(b), MCA.

The appellant argues that the court should have granted the directed verdict as to Count Four because the State failed to introduce evidence showing that Curtis used, concealed, or abandoned the certificate with the purpose of depriving Bullock of his property. She contends that Bullock knowingly made her joint owner

24

is that Curtis deceived or threatened Bullock into giving her that access and approval.

The evidence is uncontested that Curtis cashed the certificate of deposit for her own benefit thereby purposely depriving Bullock of its use. The State offered no evidence that Curtis threatened Bullock. The only question left is whether the State presented enough evidence that any rational trier of fact could find that Curtis purposely or knowingly obtained control over the certificate through deception. We hold that it did.

The task of finding evidence of purposeful or knowing deception in this case would be much more straight forward if the record contained evidence of conspicuous untruths by Curtis. See Swope v. State (Tex. App. 1986), 723 S.W.2d 216. Circumstantial evidence, however, is sufficient to prove any element of a crime, State v. Bradford (1978), 575 P.2d 83, 86, 175 Mont. 545, 550, including mental state, State v. Krum (Mont. 1989), 777 P.2d 889, 890, 46 St.Rep. 1334, 1336, and deception, State v. Howe (N.D. 1987), 413 N.W.2d 350, 354-55.

While a close question, the jury in this case could have relied on the State's circumstantial evidence to find that Curtis intentionally deceived Bullock. The evidence establishes that prior to employing Curtis, Bullock was a frugal man seldom spending more than was necessary for his daily needs. Bullock had given his niece Curry a power of attorney to oversee his financial affairs

26

indicating that he was unsure of his own abilities. When Bullock hired Curtis, the situation dramatically changed. Curtis acquired a power of attorney and took control of Bullock's finances. Over a period of thirteen months, she gradually siphoned money out of his steadily diminishing funds. She used the money for her own benefit and gave it to her children. Curtis knew that Curry had control of Bullock's finances, but failed to communicate with her about the alleged gifts. We hold that from this scenario a reasonable jury could have concluded that the appellant intentionally used her influence over the aged and vulnerable Bullock to deceive him into acting against his own best interests.

While the appellant has presented close and difficult questions on all issues, the record contains sufficient evidence to uphold her conviction.

Affirmed.

J. H. Turnage
Chief Justice

of the certificate of deposit, gave her his power of attorney, and approved of her cashing the certificate.

Although superficially persuasive, Curtis's defenses are not the real issue as the recent case of State v. Haack demonstrates. In Haack, the victims set up a $30,000 joint checking account authorizing the defendant contractor to withdraw funds to finance construction of their home. The defendant was charged with theft when he allegedly withdrew more than $10,000 for unauthorized personal purposes. We affirmed the District Court's ruling that, as a matter of law, the statute governing joint deposits and joint certificates of deposit, § 32-1-442, MCA, precluded application of theft laws to withdrawals from such accounts. Haack (1986), 220 Mont. 141, 145, 713 P.2d 1001, 1003.

Haack is distinguishable from the present case. In that case the defendant was charged with stealing from an account to which the fully-informed victims had given him access for a lawful purpose. No allegation was made that the defendant deceived them by intending to steal from the account when he entered into the arrangement. In the present case, however, the issue is not whether the appellant had the power to cash the certificate. The State does not dispute that Bullock gave Curtis joint ownership of the certificate, a power of attorney, and approval of her actions. The real issue is why he did so. The State's precise allegation

25

We concur:

_John Conway Harrison_

_Diane G. Ba____

_____

Justices

Justice R. C. McDonough dissenting.

The speedy trial issue is analogous to Senator Everett Dirkson's statement of a billion dollars here and a billion dollars there and pretty soon a lot of money is being thrown around. In this case there is a little prejudice before charging, a little more prejudice before trial, and a major infliction of prejudice when the alleged victim was found incompetent to testify.

The defendant's speedy trial rights were violated.

A 291 day delay occurred between the time the charges were filed and the time of trial. The State asserts that 49 days are chargeable to the defendant. This leaves 242 days. A delay of this magnitude necessitates a speedy trial inquiry. When faced with such an inquiry the State must assert a reasonable excuse for the delay and show that the defendant was not prejudiced. Furthermore, there is a presumption that the defendant was prejudiced by the delay and it is the State's burden to overcome it. The State has failed to do so. State v. Waters (1987), 228 Mont. 491, 743 P.2d 617.

The State's excuse of "institutional delay" does not overcome this presumption. The District Court found the delay attributable to the retirement of the presiding judge and other delays within the system. Normally, due to the

29

inherent characteristics of our criminal justice system, a six month delay is not unexpected between time of charging and the time of trial. Any systematic delays longer than six months, however, must be extraordinary and compelling or else charges should be dismissed. Such circumstances are not shown here. The presiding judge officially retired on the first Monday in January of 1989. Furthermore, the State knew that he would retire even before charges were filed in June of 1988. These facts do not rise to the level of extraordinary and compelling.

The constitutional right of a speedy trial applies to all branches of government. The executive to prosecute, the judiciary to conduct, and the legislative not to enact constitutional impediments or fail to provide sufficient resources to the other branches. Under the set of circumstances presented by this case, it is clear that the government failed in its duty to afford the defendant her constitutional right to a speedy trial. "Institutional delays" as set forth here are not satisfactory excuses.

Moreover, there is a presumption that this delay prejudiced the defendant. The victim, who was in fact the salient witness of the case, was a very elderly man in his eighties who was subject to all of the vagaries of advanced age, particularly mental deficiency. There was no extraordinary number of witnesses, the case was not unusually

30

complex, and written documents were practically all bank records obtainable by investigative subpoenas. However, 14 months transpired from the complaint to law enforcement authority until the time the defendant was charged. During this period of time the victim wrote a new will, prepared by the attorney for the complaining witness. This attorney testified that the victim was competent to dispose of his property. However, by the time of trial, approximately 18 months later, he was deemed incompetent to testify. The State's reasons for the delay in bringing the defendant to trial are insufficient to overcome the facts which clearly support the presumption that the defendant was prejudiced.

The State argues that defendant was able to present witnesses who testified as to the victim's competency at the time of the alleged criminal acts and therefore was able to present her case before the jury. However, this delay has prevented her from presenting the victim as part of her case in chief and has prevented her from cross-examining him as to the actual events surrounding the alleged criminal acts.

In view of the victim's age, physical and mental state, and the importance of his testimony, the State has not overcome the presumption of prejudice. The State knew or should have known the competency of the most important witness for the defense was likely to deteriorate. Despite this knowledge it did not take steps to bring the matter to

31

trial, and therefore the case should be reversed and the charges dismissed.


_____

Justice

We concur in the foregoing dissent of Justice McDonough.


_____
_____

Justices