**STATE of Iowa, Appellee,**

v.

**John Nell MITCHELL, Appellant.**

**No. 02–0407.**

Supreme Court of Iowa.

Sept. 4, 2003.

Rehearing Denied Oct. 30, 2003.

Linda Del Gallo, State Appellate Defender, and Dennis D. Hendrickson, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, William E. Davis, County Attorney, and Michael J. Walton, Assistant County Attorney, for appellee.

CADY, Justice.

This is an appeal by John Nell Mitchell from a conviction for second-degree sexual abuse of a child following a new trial ordered in *State v. Mitchell,* 633 N.W.2d 295 (Iowa 2001) [hereinafter *Mitchell I* ]. In *Mitchell I,* we considered Mitchell's challenge to the admission of the testimony at trial of two girls who testified Mitchell sexually assaulted them. Both girls were acquaintances of the victim, the girl Mitchell was accused of assaulting in both cases, whom we identify as Amy.[1] Ultimately, we

1. As in *State v. Mitchell,* 633 N.W.2d 295 (Iowa 2001), we have chosen to not use the

concluded the district court had errantly allowed the admission of the evidence by the other victims. *Mitchell I,* 633 N.W.2d at 300. In doing so, we accepted Mitchell's argument that the girls' testimony was impermissible evidence of his propensity to commit similar acts against Amy while rebuffing the State's assertion that the testimony was admissible for the alternative purpose of enhancing Amy's credibility. *See id.* One of the issues posed in this appeal is whether similar evidence, introduced through the testimony of Amy's mother, is admissible. We further consider whether Mitchell's sentencing following his second trial was vindictive and thus unconstitutional. For the reasons that follow, we conclude that the evidence was admissible and the sentencing was proper. We affirm the district court's judgment and sentence.

## I. Background Facts and Proceedings.

Amy was ten at the time Mitchell began living with her mother, Julie, in 1997. At some point during the spring of that year, Julie reported that her ex-husband—Amy's father—had sexually assaulted Amy. A social worker later took Amy to a doctor to confirm the abuse. While waiting to see the doctor, Amy confided in the social worker that it was Mitchell—not her father—who had abused her.

Amy later described several instances of abuse in a videotaped conversation with a police detective and recounted the abuse in her testimony at trial. The earliest acts of abuse included Mitchell touching Amy's breast and vaginal areas while she was clothed. This activity escalated to Mitchell touching Amy in the same areas but underneath her clothing. Subsequent acts included Mitchell performing oral sex and inserting his penis into her vagina on more

than one occasion. Amy also stated that he ejaculated on one occasion and threatened to kill her if she told anyone about the sexual abuse.

Mitchell was arrested and charged with three counts of sexual abuse in the second degree. After we reversed his conviction in *Mitchell I,* a second trial was held. Mitchell chose to represent himself in the new trial with stand-by counsel aiding him. After a nearly weeklong trial, the jury returned a verdict of guilty on all three counts. Mitchell was then sentenced to three consecutive sentences of twenty-five years each, to run consecutive to a preexisting two-year sentence. He challenges the district court's judgment and sentence with this appeal.

## II. Standard of Review.

██ We review a district court's decision on the admissibility of evidence for an abuse of discretion. *State v. Sallis,* 574 N.W.2d 15, 16 (Iowa 1998). A claim of vindictiveness in sentencing implicates constitutional guarantees of due process, making our review of that issue de novo. *See In re C.M.,* 652 N.W.2d 204, 209 (Iowa 2002).

## III. Evidence of Prior Bad Acts.

██ Mitchell's first claim of error centers on the admission of testimony elicited by the State on cross-examination of Amy's mother. Mitchell called Amy's mother as a witness in his case in chief, apparently in an effort to establish that she met with the police detective before his interview with Amy in an effort to slant the evidence against Mitchell or otherwise conspire against him. Mitchell's general defense at trial was that DHS social workers, Scott County law enforcement, and mem-

true names of the victims and instead adopt the aliases used in that opinion.

bers of Amy's family conspired to bring about his conviction.

During Mitchell's direct examination of the mother, the following exchange occurred:

Q. You was interviewed by a Dr.—Michael Venema, a police officer, in May of '98, was you not? A. I think it was around that time. I can't swear to it.

Q. Okay. I believe his testimony is he interviewed you May of '98, the 8th day of May '98, and I believe he scheduled an appointment with [Amy] to interview her, if you have any knowledge of that I think probably in June '98, the 12th day. Do you have any knowledge of that? A. Of him interviewing her?

Q. Yeah. A. Yes, I gave him her name, so I wasn't called in on her. I was called in on [Karen] and [Susanna].

Q. Well, I'm asking you about [Amy]. A. Yes.

MR. WALTON [(the prosecutor)]: No. He was asking her about the interview, and she just told him what the interview was about.

THE COURT: She answered your question, Mr. Mitchell.

This exchange prompted the following cross-examination by the State:

Q. Mrs. [C.], Mr. Mitchell asked you about a meeting you had with Detective Venema on May 8 of 1998. A. Yes.

Q. And that meeting had nothing to do with your daughter, [Amy], did it? A. No, it did not.

Q. In fact, in the beginning of that meeting—maybe you know this; maybe you don't—Detective Venema had no idea that you were the mother of a girl that had lived with John Mitchell. A. No, he was not.

Q. He became aware of that after meeting with you. Is that correct? A. Yes, after the conversation we had about

the reason I was there with [Karen] and [Susanna], then I asked him.

Q. Okay. What was the purpose of the meeting you had with Detective Venema on May 8 of 1998? A. Okay. They came up to Mrs. [P's] and asked me to come to the police station because there had been a report filed from Debbie [F.]—

Q. Who is Debbie [F.]? A. That's [Karen]—

THE DEFENDANT: Objection, your Honor. That has nothing to do with this.

A. [Karen] and [Susanna's] mother.

THE DEFENDANT: It has nothing to do with this. I object.

. . .

THE COURT: Can you state what your objection is?

THE DEFENDANT: My objection is Mr. Walton trying to bring in other issues that—to mislead the jury totally away from what this case is about. You instructed me not to go beyond a certain scope that he object to, which is I feel exculpatory evidence that this jury should know. If he's gonna go with that, I will go further.

THE COURT: Mr. Mitchell, based on that objection, that's overruled. You may answer.

Q. What was the purpose of the meeting with Detective Venema on May 8 of 1998? A. Okay. As I stated, Debbie [F.] made a complaint against John Mitchell—that is [Susanna] and [Karen's] mother—that he had been sexually abusing them.

Q. Okay. Who is Debbie [F.]? A. That's [Karen] and [Susanna's] mother. I lived with her for a time of period [sic].

Q. Are you a friend of Debbie [F.]? A. Yes, I am.

Q. And was John Mitchell a friend of Debbie [F.'s] family? A. Yes.

Q. Okay. Who was [Karen]? A. She's Debbie's oldest daughter.

Q. And in 1997, 1998, what was her age, approximately? A. Approximately about 12. I think she was a year older than [Amy].

Q. Okay. And that's who Detective Venema wanted to talk to you about? A. Yes.

Q. And did he want to talk to you about anything else? A. No. That was—just what knowledge I had of John having contact with these children.

Q. And were—you said children. Were there other children? A. Yes. There was [Karen's] younger sister, [Susanna], and then I told him maybe he ought to talk to my daughter [Amy] because of the way they were acting. It was all type of the same over and over—after I sat back and looked at it, each one of the children were acting out the same, throwing fits, tearing things up.

Q. And it was at that point on May 8 of 1998 that you informed Detective Venema that you had a daughter that had also been with Mr. Mitchell. A. Yes, sir.

Q. And was that the first time Detective Venema knew about [Amy]? A. Yes, sir.

Q. As far as you know? A. Yes, sir.

MR. WALTON: Thank you. I have no further questions.

Mitchell alleges that the State's cross-examination produced indirectly the same evidence of prior bad acts—the alleged sexual abuse of two other girls—which we declared inadmissible in *Mitchell I* where similar information was introduced directly through the testimony of the victims, Karen and Susanna. *See Mitchell I*, 633 N.W.2d at 300; Iowa R. of Evid. 5.404(*b*).

The State responds by arguing that Mitchell's objection to this evidence was insufficient to preserve this issue for appeal and, in the alternative, that the evidence was presented after Mitchell "opened the door" to refute his general conspiracy defense. The State also argues that the testimony was not impermissibly prejudicial, particularly because the prosecutor did not belabor the issue. *See* Iowa R. Evid. 5.403. Mitchell responds to these arguments by asserting that a fair reading of the record refutes the State's arguments related to error preservation and invited error. Moreover, even if the evidence was relevant—a point he does not concede—the State simply went too far when eliciting the prejudicial disclosure of Mitchell's alleged abuse of the other two girls.

Although there may be a question of whether Mitchell adequately preserved error by his objection, we believe this issue is resolved under both of the State's alternative arguments. *See State v. Grosvenor*, 402 N.W.2d 402, 406 (Iowa 1987) ("The fact that defendant appeared pro se does not excuse his failure to preserve this claim of error."). We have long subscribed to the maxim that, " 'one who induces a trial court to let down the bars to a field of inquiry that is not competent or relevant to the issues cannot complain if his adversary is also allowed to avail himself of the opening.' " 1 John W. Strong, et al., *McCormick on Evidence* § 57, at 253 (5th ed. 1999) (quoting *Warren Live Stock Co. v. Farr*, 142 F. 116, 117 (8th Cir.1905)); *see also State v. Spilger*, 508 N.W.2d 650, 652 (Iowa 1993); *State v. Payton*, 481 N.W.2d 325, 328 (Iowa 1992); *State v. Finnigan*, 478 N.W.2d 630, 631–32 (Iowa 1991); *State v. Jones*, 471 N.W.2d 833, 835–36 (Iowa 1991); *State v. Williams*, 195 Iowa 785, 796–98, 192 N.W. 901, 906–07 (1923). In his direct examination of Amy's mother, Mitchell pursued a line of questioning to inferentially bolster his conspira-

torial theory of the case, eliciting testimony that she met with the police prior to the time the police interviewed Amy. The record is replete with instances of Mitchell attempting to establish evidence of an un-

toward conspiracy, including his opening statement,[2] his examination of Amy,[3] her social worker,[4] and the detective who investigated Amy's abuse,[5] his closing statement,[6] and elsewhere. We believe Mitch-

2. That is what the State is doing here today, and I intend to prove that the police officer, Dawn Sturms [(the social worker in whom Amy confided)], Dr. Ozaki [(the doctor who examined Amy for abuse)], and the investigator all knew that this never happened, but because Department of Human Services job is to keep the family together, what they would do, get me out of the way.

Well, it still didn't happen because [Amy's mother] still didn't go back, but I got to pay for her leaving her husband. That's what's going on here today, and I'm still paying for it and ain't did nothing....

3. Q. Well, your dad was accused, right? A. Yeah.

Q. And now I'm accused, right? Now, could it be that y'all flipped the tables but now they know the truth anyway so you stay with anybody else? A. No. It has nothing to do with this that I don't live with my dad.

Q. Get John out of the picture, revenge for your dad. Is that right, [Amy]? A. No. It has nothing to do with any of this that I don't live with my dad.

Q. It doesn't? A. No. None of this has to do with the reason I don't live with my dad.

Q. Why the dad was so fussy about getting you to stay with him and now you don't? A. Because I'm his daughter and I was ten years old and he didn't want me living [with you and my mother] in a crack house.

Q. To get you away so he could clear his name and you could point the finger at me. Is that right? A. No. I told the truth—....

4. Q. Okay. And I could tell by this document here that it seems to me that the department goal was—the whole purpose of working with her was to clear the father's name and then close the case and then reopen the case and put it on Mom's boyfriend about a year and a half later when everybody would possibly done forgot about, oh, this happened and that happened, so if we open the case and just go straight at him, okay, possibly he would be done forgot about all the information that was done earlier. That's the purpose, wasn't it? A. No, that was not the purpose. The information that came out regarding that you had

sexually abused her was not a year and a half later. It was one month after we began services....

5. Q. Would you say that if DHS was involved in this thing here, which is the way it look to me—I can't give statements, but I can ask, but wouldn't you say DHS was involved and they prepared this case and left it there for you to come pick up as if you got some new information and [Amy] was your prime suspect to go check it out because of John Mitchell and the mother had disagreements with the father, his name had come up, now to clear him, they got to go all out? A. I didn't hear a question in there anywhere. You said you had a question, and I didn't hear one.

Q. Well, my question is, is that did DHS leave this—did DHS leave things unsolved so you could come in and make this look like—to prepare—basically what I'm getting at is, wouldn't you say that [Amy]—did [Amy] ever tell you that she had been to DHS, the Court had did anything? She never informed you of that? A. No, I had no knowledge of any previous investigation from any person....

6. [Detective Venema] talked to [Amy] on the 12th. He talked to [her mother] on the 8th, so I'm quite sure she gave him some rundown that possibly maybe if he was messing with [Amy], he used a condom or something. If [her mother] had have said yeah, well, we kept condoms in the house, that would have helped him.

You understand what I'm saying? But he know that I was gonna defend myself and say, hey, you know what I'm saying? I don't mess with no condoms, so what he did, he told [Amy], say he didn't use no condoms. Say some white stuff came out. Okay? Exactly. [Amy's mother] got up there and said, no, no condoms.

She know about that tape [of Amy's conversation with Detective Venema] there, but [the prosecutor] will tell you she never seen it, but she knows what's on that tape. That's why she was so smiley when she say no, no condoms. Believe what [Amy] said on the tape.

ell's direct examination of Amy's mother was also in furtherance of this theory of the case and thus opened the door to refutation of that theory in the State's cross-examination. The questions asked on direct examination by Mitchell did not necessarily open the door, but the inference he sought to draw from the questioning did. Thus, the State was entitled to rebut this conspiracy theory with evidence of the actual facts that caused Amy's mother to meet with police before the police interviewed Amy.

Moreover, the testimony elicited on cross-examination did not belabor Mitchell's relationship to the other two girls or go into extensive detail about the alleged acts or any further criminal action taken as a result of those acts. The questions merely revealed that a complaint had been filed against Mitchell involving two other girls and the police sought to interview Amy's mother to determine if she had any information concerning the complaint. For this reason, we agree with the State that whatever effect was created by the testimony was insufficiently prejudicial to overcome the evidence indicating Mitchell's guilt. *See State v. Knox*, 536 N.W.2d 735, 742 (Iowa 1995) ("The only direct evidence is the complainants testimony. But under today's law, that is sufficient to convict. The law has abandoned any notion that a rape victim's accusation must be corroborated."). Ultimately, this incident is distinguishable from *Mitchell I*, where the inadmissible evidence consisted of the actual testimony of Karen and Susanna and was offered for no legitimate purpose other than to show Mitchell's propensity to abuse Amy. *See Mitchell I*, 633 N.W.2d at 300. Additionally, the record in the first case did not disclose the existence of a conspiracy theory involving Amy's mother, which would have entitled the State to rebut the theory. In this trial, Mitchell opened the door through which the State attempted to undermine his theory of the case by showing the actual circumstances that explained why Amy's mother spoke with the police detective prior to Amy being interviewed. He cannot now complain that the State took advantage of this method of attacking his theory, particularly when the State's response was not overly prejudicial.

## IV. Alleged Vindictiveness in Sentencing.

Mitchell also argues that a disparity in the length of the sentences ordered by the district court in his first and second trials evinces vindictiveness on the part of the court in violation of constitutional due process guarantees. At the end of his first trial, Mitchell was sentenced to two consecutive terms not to exceed twenty-five years each. A third term was ordered to run concurrently with the other two twenty-five-year sentences. A fourth term—for indecent contact with a child—was also ordered to run concurrently with his other sentences. When explaining his reasoning for sentencing Mitchell to what amounted to a period not to exceed fifty years, the district judge explained:

The Court did not have any option as to whether incarceration would be granted or not, but the reason—the reasons for the consecutive sentences are as follows: The Court has reviewed . . . the presentence investigation report, including the prior criminal record. And basically the reason for the consecutive sentences are because of the prior criminal record which include prior sexual offenses regarding children. Number two, the seriousness of these offenses. And those are the reasons. Protect the

That's what she getting at. That's exactly what she getting at. . . .

community, seriousness of the offenses, and prior criminal record.

After being convicted of the three counts of sexual abuse in the second degree in his new trial, Mitchell was sentenced by a different district judge to three consecutive terms not to exceed twenty-five years each. His additional sentence for indecent contact with a child was also ordered to run consecutively to his other three sentences, meaning he was sentenced to a total period not to exceed seventy-seven years. In sentencing Mitchell, the court explained:

> The reasons for the sentences are— the sentences are mandatory on each count. The reason for the consecutive sentence on each Count and based on the former conviction in 1999 of indecent contact with a child are the facts that you have been convicted of sex abuse charges, one of which was here in Scott County and the other which was in Dade County, Florida in 1986, and also the facts and circumstances surrounding each Count for which you were convicted in this case.

 Mitchell is correct in asserting that an increase in sentence length between a first and second trial is a red flag for possible judicial vindictiveness in sentencing. Ordinarily, judges are given broad discretion in sentencing an offender. *See State v. Rodenburg*, 562 N.W.2d 186, 187 (Iowa 1997). However, because the imposition of "a harsher sentence upon reconviction for the purpose of punishing a defendant for exercising his rights in seeking to have the conviction set aside is a flagrant violation of due process of law," the utmost scrutiny must be applied to ensure that the second sentence was not the product of vindictiveness. *Connelly v. Comm'r of Corr.*, 258 Conn. 374, 780 A.2d 890, 896 (2001). While we have not had the opportunity to fully develop standards

under which a claim of vindictiveness can be examined, the United States Supreme Court's many statements on this issue provide appropriate guidance for our current and future consideration. *See Callender v. Skiles*, 591 N.W.2d 182, 187 (Iowa 1999); *see also* Stephen G. Murphy, Jr., Comment, *Limits on Enhanced Sentences Following Appeal and Retrial: Has Pearce Been Pierced?*, 19 Conn. L.R. 973, 974–85 (1987) (discussing the progression of the Court's jurisprudence in the vindictive sentencing area).

The Court's first pronouncement in this area came in *North Carolina v. Pearce*, where it laid out the baseline approach to judicial vindictiveness questions:

> Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.

> In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

395 U.S. 711, 725–26, 89 S.Ct. 2072, 2080–81, 23 L.Ed.2d 656, 669–70 (1969) (footnote omitted).

*Pearce* led most courts that construed it to extend a presumption of vindictiveness in cases in which a sentence increased after a retrial arising from a successful challenge to a prior conviction. *See Wasman v. United States*, 468 U.S. 559, 565, 104 S.Ct. 3217, 3221, 82 L.Ed.2d 424, 430 (1984). Mitchell claims he was entitled to this presumption in this case. Since *Pearce*, however, the Court has shaped the contours of this due process protection, clarifying the *Pearce* rule. *See Connelly*, 780 A.2d at 896–98 (summarizing Court holdings related to the vindictiveness standard). Most importantly, in *Texas v. McCullough*, the Court observed:

> Beyond doubt, vindictiveness of a sentencing judge is the evil the Court sought to prevent rather than simply enlarged sentences after a new trial. The *Pearce* requirements thus do not apply in every case where a convicted defendant receives a higher sentence on retrial. Like other "judicially created means of effectuating the rights secured by the [Constitution]," we have restricted application of *Pearce* to areas where its "objectives are thought most efficaciously served." Accordingly, in each case, we look to the need, under the circumstances, to "guard against vindictiveness in the resentencing process."

475 U.S. 134, 138, 106 S.Ct. 976, 978–79, 89 L.Ed.2d 104, 110 (1986) (citations omitted); *see also Alabama v. Smith*, 490 U.S. 794, 799, 109 S.Ct. 2201, 2204–05, 104 L.Ed.2d 865, 872–73 (1989). In *McCullough*, the Court determined that the *Pearce* presumption was inapplicable, partially "because different sentencers [(a jury and then a judge)] assessed the varying sentences that McCullough received." *Id.* at 140, 106 S.Ct. at 979, 89 L.Ed.2d at 111–12.

■ Subsequent interpretations of the *McCullough* approach to questions of judicial vindictiveness in sentencing have resulted in the conclusion that "when a different judge sentences a defendant after a retrial, *and* that judge articulates logical, nonvindictive reasons for the sentence, there simply is no sound basis to presume that the sentence is the product of judicial vindictiveness." *Connelly*, 780 A.2d at 901; *see also State v. Robbins*, 123 Idaho 527, 850 P.2d 176, 180–81 (1993); *State v. Colwell*, 127 Idaho 854, 908 P.2d 156, 161 (Ct.App.1995); *State v. Forsyth*, 233 Mont. 389, 761 P.2d 363, 384 (1988), *overruled in part by State v. Curtis*, 241 Mont. 288, 787 P.2d 306, 313 (1990); *People v. Best*, 127 A.D.2d 671, 511 N.Y.S.2d 897, 898 (N.Y.App.Div.1987); *Commonwealth v. Mikesell*, 371 Pa.Super. 209, 537 A.2d 1372, 1380–81 (1988). However, this does not mean that the examination of an increased sentence is toothless, for if a defendant is able to show actual vindictiveness on the part of the second judge, he or she may still prevail on a claim of judicial vindictiveness. *See Smith*, 490 U.S. at 799–800, 109 S.Ct. at 2205, 104 L.Ed.2d at 873; *Connelly*, 780 A.2d at 898; *Robbins*, 850 P.2d at 181; *Colwell*, 908 P.2d at 161–62; *Forsyth*, 761 P.2d at 384; *Best*, 511 N.Y.S.2d at 898; *Mikesell*, 537 A.2d at 1381.

We believe that the standards elucidated by the Supreme Court and other state appellate courts for cases in which two different judges sentence a defendant accurately balance the due process interests of the criminal defendant and the systemic realities of our court system. Although a defendant must still be protected from vindictiveness in sentencing—a goal achieved by assuring the absence of actual vindictiveness—the type of concerns first identi-

fied in *Pearce* are simply less likely to arise when a different judge sentences a defendant at each stage. To conclude otherwise casts unwarranted opprobrium over our judicial system and implies that a common goal within the judicial ranks is to "save face" at all costs. *See McCullough*, 475 U.S. at 139, 106 S.Ct. at 979, 89 L.Ed.2d at 111. Although we reserve the right to check the sentencing power of our district courts, we refuse to undermine that power in a case of this type absent the presentation of evidence that actual vindictiveness has already done so.

Mitchell alleged vindictiveness in his sentencing based on the increase between his first and second sentence. As we have already noted, in a case such as this one, in which two different judges have produced the disparity in sentencing, a presumption of vindictiveness does not apply. For that reason, we must further consider whether his second sentence was tainted by actual vindictiveness. Mitchell does little to advance such an argument, but even if he did, we believe the record contains no indication of actual vindictiveness. Instead, the judge posited logical, non-vindictive reasons for his sentence and acted well within the discretion normally accorded the court in sentencing. *Connelly*, 780 A.2d at 901. The mere fact that two judges viewed the situation differently and ordered different sentences does not indicate actual vindictiveness. *See id.* at 900–01. Thus, Mitchell's claim of vindictiveness in sentencing fails.

## V. Conclusion.

We affirm the decisions of the district court on all challenged issues and therefore affirm its judgment and sentence.

**AFFIRMED.**