NO.   93-134

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

STATE OF MONTANA.

        Plaintiff and Respondent,

    -v-

JAMES EDWARD THOMPSON,

        Defendant and Appellant.

FILED

DEC 22 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Twenty-first Judicial District,
              In and for the County of Ravalli,
              The Honorable Ed McLean Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            William F. Hooks, Appellate Defender Office,
            Helena, Montana

        For Respondent:

            Hon. Joseph P. Mazurek, Attorney General, Cregg W.
            Coughlin, Assistant Attorney General, Helena,
            Montana; George H. Corn, Ravalli County Attorney,
            Hamilton, Montana


                        Submitted on Briefs:  October 5, 1993

                                Decided:  December 22, 1993

Filed:

                        _____
                                  Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Defendant James Edward Thompson (Thompson) appeals a jury verdict from the Montana Fourth Judicial District, Ravalli County (now the Twenty-First Judicial District), which convicted him of felony assault.  We affirm.

The following issues are presented for our review:

1.  Did the District Court err in permitting the jury to consider certain statements made by the defendant at the omnibus hearing?

2.  Did the District Court err in permitting a medical doctor to testify as to the victim's identification of the perpetrator?

3.  Was defendant denied his right to a speedy trial under the Montana and United States constitutions?

On Monday, March 9, 1992, ten-year-old K.T. was talking to Cindy Duarte (Duarte), a teacher at the Corvallis school which she attended.  During their conversation, K.T. coughed and grabbed her side, complaining that her side hurt, and then showed her bruises and scrapes to Ms. Duarte.  Duarte asked K.T. what had happened and K.T. responded that her stepfather had repeatedly kicked her. Upon further questioning from Duarte, K.T. revealed another injury on her leg.

Duarte advised the school principal of what she had observed: the principal then contacted Linda **Heyes (Heyes),** a social worker with the Department of Family Services, who in turn notified the Ravalli County Sheriff's office.  **Heyes** and Officer Pat Richie investigated the matter: they met with K.T.  at the school and

looked at K.T.'s injuries. They noted that K.T. had bruises on her left arm, on her left torso, on her back, on her legs and on her shin. Heyes described the injuries as "extensive and severe"; Officer Richie described them as "pretty extensive."

Heyes and Richie took K.T. to the emergency room at Marcus Daly Hospital in Hamilton because K.T. complained of pain when she coughed and when she breathed. Dr. Brett Bender, the emergency room physician, examined K.T. and observed numerous bruises over K.T.'s chest, back, right leg and left arm. When Dr. Bender asked her why she was there to see him, she told him that her stepfather had kicked her numerous times. Dr. Bender noted that the bruises were 20-30 hours old and were consistent with injuries sustained from kicking.

When K.T. referred to her "stepfather," she meant the defendant, James Edward Thompson. Thompson testified that he and K.T.'s mother are common law husband and wife. Heyes spoke with Thompson about the incident and he told her that he had grabbed K.T. by the hair and thrown her up onto a dresser, but that he had not kicked her. He further claimed that K.T. had injured herself when she had a tantrum in the garage and threw herself up against a woodpile, against car parts and then against the woodpile again.

Thompson was charged with felony assault on May 6, 1992. Counsel was appointed to defend Thompson, but he expressed dissatisfaction with that representation as well as the public defender system in general. At the omnibus hearing on May 26, Thompson asked to personally address the District Court. Against

3

the advice of his counsel, he then read a prepared statement to the court. Thompson also read the statement although the District Court had admonished him at the urging of the Ravalli County Attorney that anything he stated would be used against him. This statement was subsequently read to the jury at Thompson's trial for felony assault.

Further facts will be provided as necessary in the opinion.

I.

Did the District Court err in permitting the jury to consider certain statements made by the defendant at the omnibus hearing?

Prior to trial, Thompson filed a motion in limine to suppress the admission into evidence of certain statements he had made at the omnibus hearing. The portion of the transcript of the omnibus hearing admitted into evidence, which Thompson sought to suppress, is as follows:

> [Thompson]: . . .The first remark refers to two parts of the First Amendment to the United States Constitution. This amendment has been and is proven thoroughly in several cases by state, federal and supreme courts of these United States.
>
> The charges brought today against me are a direct and contradictory action against the references to religion and religious freedom. Christianity in the New Testament of the Bible refers specifically to the use of force on and in the rearing of children. It is direct in its quotation, "To spare the rod and spoil the child."
>
> Mr. CORN: Your Honor, may I object: The Defendant should be admonished that anything he states can be used against him.
>
> THE COURT: You previously have been read your rights, have you not?
>
> THE WITNESS: Yes, I have.
>
> THE COURT: You understand that any of these

4

statements you are now making can be transcribed and read to a jury at a later time?

THE WITNESS: Yes, I do.

THE COURT: YOU may proceed.

THE WITNESS: This means that if this Court, through future hearings, decides I, myself, am guilty of inflicting damage upon the minor child, which I doubt will happen,. it must then decide if as a parent or guardian I, or any parent, am within or without my constitutional freedoms to do so.

Having not had a formal education in law or mediation, much of my knowledge is firsthand from reading this constitutional entry which directly stipulates that congress or no law-making establishment may or will make any laws regarding religions.

This openly means that if a person -- any person -- in an attempt to live a life in his personal religious manner may not be made to submit to the atrocities of invasion of privacy, discrimination or to answer for his personal religious views in an open court or to be brought before a charge which he may believe is a Godly action.

Remembering that in Christianity, child sacrifice was also accepted, any form of action less would be a merciful action.

Over the objection of defense counsel, the prosecutor read the above-quoted statement aloud during the State's case-in-chief. Thompson had alleged in his motion in limine that the above statements were prejudicial because they were the result of an "emotional outburst" and were irrelevant to the crime charged.

The District Court denied the motion to suppress the statements from evidence because Thompson had no basis for asserting that the statement was an "emotional outburst." In the Opinion and Order denying Thompson's motion in limine, the District Court stated:

Defendant has filed a Motion in Limine to exclude the use by the State of a statement which Defendant read to the Court at the end of the May 26, 1992 omnibus hearing. Defendant asked the Court if he could read his prepared statement to the Court. At that time the Court again advised him of his rights. Defendant responded that he understood his rights and that he wanted to make the public statement even though it was against the advise (sic) of his own counsel. Defendant's argument that the statement was an emotional outburst is without factual basis. Defendant appeared calm and composed as he read the lengthy, pre-prepared public statement to the Court. Defendant's statement was made voluntarily, with full knowledge of his rights, and is therefore admissible. . . .

On appeal, Thompson makes three arguments relating to his statement. Thompson first contends that the District Court erred by permitting the State to read the statement because it was neither an admission nor a confession. He further contends that the District Court then exacerbated the error by instructing the jury as to how to weigh the statement as an admission or confession when in fact the statement was neither an admission nor a confession. Finally, he claims that the statement was unduly prejudicial and that any probative value was outweighed by the prejudicial effect.

We first conclude that this is the sort of statement which this Court has characterized as an admission. See, e.g., State v. Stevens (1921), 60 Mont. 390, 199 P. 256. Thompson's statement indicates that he believed that the First Amendment allowed him to punish his stepdaughter as he saw fit: this statement is inconsistent with his theory of innocence which was that he did not inflict the injuries upon K.T. by kicking her and that she had injured herself in a tantrum. Statements or declarations of

6

independent facts which are inconsistent with any theory of innocence on the part of a defendant, thus tending to prove the defendant's guilt although on a different set of facts, are competent evidence as admissions against interest. Stevens, 60 Mont. at 401-02, 199 P. at 259.

"An 'admission' is defined as an avowal or acknowledgement of a fact or of circumstances from which, together with other facts, guilt may be inferred." State v. Goltz (1982), 197 Mont. 361, 369, 642 P.2d 1079) 1084, (quoting 22A C.J.S. Criminal Law § 730(a)(1961)). An admission does not acknowledge guilt; rather, it tends to establish guilt. Goltz, 642 P.2d at 1084. See also People v. Stewart (1984), 473 N.E.2d 840, cert. denied sub nom. Stewart v. Illinois, 471 U.S. 1131, 105 S.Ct. 2666, 86 L.Ed.2d 283, reh'g denied 473 U.S. 921, 105 S.Ct. 3548, 473 U.S. 921, 87 L.Ed.2d 671.

We further conclude that the District Court did not err when it instructed the jury with regard to admissions and confessions by giving the following jury instruction:

**Admission or confession.**

A statement made by a defendant other than at this trial may be an admission or confession.

A confession, as applied in criminal law, is a statement by a person made after the offense was committed that he committed or participated in the commission of a crime. An admission is a statement made by the accused, direct or implied, of facts pertinent to the issue, and tending, in connection with proof of other facts, to prove his guilt. A conviction cannot **be based** on an admission or confession alone.

The circumstances under which the statement was made may be considered in determining its credibility or

7

admission or a confession was made by the defendant, and if so, whether such statement is true in whole or in part. If you should find that any such statement is entirely untrue, you must reject it. If you find it is true in part, you may consider that part which you consider to be true.

Evidence of an oral admission or oral confession of the Defendant should be viewed with caution.

Thompson claims that the court erred when it instructed the jury as to both a confession and an admission. This Court has previously ruled that if the instructions, viewed as a whole, fully and fairly instruct the jury on the law applicable to the case, we will find no error on the part of the district court. State v. Lundblade (1981), 191 Mont. 5.26, 529, 625 P.2d 545, 548.

It is important that the jury be made aware of the distinction between an admission and a confession and that a conviction cannot be based on an admission alone. In State v. Hallam (1978), 175 Mont. 492, 503, 575 P.2d 55, 62, we stated that "a 'confession' is an admission of the crime itself and an 'admission' concerns only some specific fact which, in turn, tends to establish guilt or some element of the offense." Here, the court made the jury aware of the distinction between an admission and a confession by the jury instruction quoted above. The court further instructed the jury to view an admission or a confession with caution. The instruction left it up to the jury to determine what it was, whether or not it was there and what effect to give it. The instruction is a correct statement of the law. We conclude that the District Court did not err in instructing the jury on the law applicable to this case.

Finally, Thompson contends that his statements should have

8

been excluded, even if relevant, because the prejudicial effect of the evidence outweighed any probative value. Admissions by a party opponent which are not hearsay are admissible, but they are still subject to other rules of evidence and to constitutional safeguards. A statement containing admissions such as Thompson's above-quoted statement is not hearsay. Rule 801(d)(2), M.R.Evid.

The Rules of Evidence provide that evidence must be relevant to be admissible. Rule 402, M.R.Evid. Relevant evidence may be excluded if the danger of unfair prejudice substantially outweighs its probative value. Rule 403, M.R.Evid. The probative reason for the State's introduction of the statement into evidence is that the statement is <u>inconsistent with Thompson's claim at trial that he had not kicked K.T.,</u> thus tending to throw doubt upon the denial at trial.

> The probative value, therefore, of the use of admissions is twofold:
>
> In the first place, all admissions may furnish, as against the opponent, the same discrediting inference as that which may be made against a witness in consequence of a prior self-contradiction; . . . [Secondly,] all admissions, used against the opponent, satisfy the hearsay rule, and, when once in, have such testimonial value as belongs to any testimonial assertion under the circumstances: and the more notably they run counter to the natural bias or interest of the party <u>when made,</u> the more credible they become: this element adding to their probative value, but not being essential to their admissibility.

4 J.Chadbourn, <u>Wigmore on Evidence</u> § 1048 (1972) (emphasis is original).

A requirement that the statement be voluntary relates to the Fifth Amendment privilege against self-incrimination and from

9

requirement of due process. 23 C.J.S. Criminal Law § 892 (1989). Whether a statement is voluntary also turns on the "totality of the circumstances" of the particular case. 23 C.J.S. Criminal Law § 893 (1989).

> . . . The question is whether [an] accused's will was overborne, so that the statement is not the product of a rational intellect and a free will. The statement must not have been extracted by the exercise of any improper influence.
>
> Various factors are considered. A statement is not necessarily voluntary merely because it resulted from a knowing choice in the sense of a choice made by a person with a capacity for conscious choice, or was preceded by other incriminating statements, or because of various other factors.

23 C.J.S. Criminal Law § 893 (1989).

In State v. Gould (1985), 216 Mont. 455, 466, 704 P.2d 20, 28, we emphasized that the determination of admissibility is based on the "totality of the circumstances." We said:

> An admission is competent and admissible where the defendant is found capable of understanding and responding in an intelligent manner. This determination is based upon the totality of the circumstances, which includes consideration of the "defendant's demeanor, coherence, articulateness, his capacity to make full use of his faculties, his memory and his overall intelligence." . . . (Citation omitted.)

In Gould, the defendant and another person were involved in an automobile accident, in which the other person was killed. When help arrived at the scene of the accident, Gould was unconscious and he did not speak until he was warmed up. At the scene of the accident, Gould stated that he had been driving. Gould later denied that he had been driving, claiming that the deceased person had been driving. He contended that his statement that he was

10

driving, made after the accident, should not be admitted in his trial for negligent homicide because he was in shock and so intoxicated that he was incapable of making a voluntary statement. The admission was allowed into evidence as being competent because the evidence indicated that Gould became coherent and was able to carry on a normal conversation with no delay in responses, his responses were clear and understandable, and his responses were logical and rational. There was additional evidence that Gould's blood pressure and pulse were within a normal range and that he responded consistently when asked whether he had been driving the vehicle. Gould, 704 P.2d at 28-29.

Here, the District Court determined that the defendant understood his rights and that he wanted to make the public statement even though it was against the advice of his court-appointed counsel. We conclude that the District Court based its decision to admit the defendant's statement on a totality of the circumstances, properly considering relevant factors including those referred to in Gould. The court specifically noted that Thompson made the statements voluntarily "with full knowledge of his rights" and that "Defendant appeared calm and composed as he read the lengthy, pre-prepared public statement to the Court."

The District Court's determination of admissibility will not be disturbed absent an abuse of discretion. State v. Hall (1990), 244 Mont. 161, 169, 797 P.2d 183, 189. The balancing of probative value versus unfair prejudice of evidence is within the discretion of the trial court. State v. Devlin (1991), 251 Mont. 278, 283,

11

825 P.2d 185, 188..

In Devlin, the trial court excluded some of the photographs which the State had intended to submit because they were gruesome, but did not exclude all of the photographs. In this case, Thompson's statements could be considered as having significant probative value if the jury concluded that they established his state of mind and were relevant because they were inconsistent with his statements that the child had injured herself. The danger of "unfair prejudice" is the danger that the evidence will prompt the jury to decide the case on an improper basis. Unfair prejudice can arise from facts that arouse the jury's hostility or sympathy for one side without regard to its probative value, evidence that confuses or misleads the trier of fact, or evidence that might unduly distract the jury from the main issues. 1 J. Strong, McCormick on Evidence § 185 (4th ed. 1992). The District Court warned Thompson that his statements could be read to the jury at the trial but Thompson nonetheless proceeded to read the statement to the court. The District Court also instructed the jury, at Thompson's request, as follows:

> Use of force by parent, guardian, or teacher. A parent or an authorized agent of any parent or guardian, master, or teacher is justified in the use of such force as is reasonable and necessary to restrain or correct his child, ward, apprentice or pupil.

In State v. Higareda (1989), 238 Mont. 130, 134, 777 P.2d 302, 305, we affirmed the district court's admission into evidence of defendant's statement to his parole officer that he "really screwed up." We stated:

12

The defendant voluntarily made the statements after he had been arrested and advised of his rights . . . Defendant initiated the conversation . . . Although defendant was required to inform his parole officer of arrest, the statements he made during the telephone conversation were not a result of an interrogation but were made freely and conveyed voluntarily. While some prejudicial effect is inherent in this type of testimony, we cannot say that it outweighed the probative value.

Hisareda, 777 P.2d at 305.

We conclude that any danger that the case could be decided on an improper basis here was outweighed by the probative value of the evidence.

We hold that the District Court did not abuse its discretion by permitting the jury to consider the statements made by the defendant at the omnibus hearing.

## II.

Did the District Court err in permitting a medical doctor to testify as to the victim's identification of the perpetrator?

During the State's case-in-chief, Dr. Bender was asked if he had determined how the bruises had occurred. He responded that he typically asks his patients an open-ended question, such as "Why are you here to see me?" Over the objection of defense counsel, Dr. Bender was allowed to testify that K.T. had told him that her stepfather had inflicted her injuries by kicking her in response to his general question of why she was there to see him.

Thompson contends that the physician was properly allowed to testify as to his diagnosis or treatment and as to the mechanism of the injury, but that he should not have been allowed to testify as to the identity of the person who kicked her because it had no relevance to his diagnosis or treatment. Thompson also contends

13

that **although** Dr. Bender did testify that it was important for him to know the mechanism of injury to determine if X-rays were necessary, he did not testify that it was important for him to know who delivered the impact.

Thompson relies on State v. Harris (1991), 247 Mont. 405, 808 P.2d 453, for his argument that Dr. Bender should not have been allowed to testify that K.T. had told him her stepfather had kicked her. <u>Harris</u> does not prevent a <u>medical</u> doctor from testifying about statements made for purposes of medical diagnosis and treatment--it prevents a counselor from testifying about the credibility of a child victim of sexual abuse. <u>Harris,</u> 808 P.2d at 457. Statements made to a medical doctor for the purpose of medical diagnosis or treatment are admissible, including statements relating to "the inception or general character of the cause or external source thereof." Rule 803(4), M.R.Evid.

Statements made to medical doctors for the purpose of medical diagnosis and treatment must satisfy a two-part test before they come within the Rule 803(4), M.R.Evid., exception to the hearsay rule: (1) the declarant's motive in making the statement must be consistent with seeking medical treatment and (2) the statement must be of a type reasonably relied on by a physician when making diagnosis and treatment decisions. <u>Harris,</u> 808 P.2d at 457. In this case, Dr. Bender testified as follows:

> [Dr. Bender] After interviewing the patient, I asked exactly what had happened, and after examining her, I did order a chest x-ray as well as an x-ray of the left humerus, which is the upper part of the arm.
>
> Q    Referring your attention to your interview of the

14

patient, did you determine how the injuries occurred?

A    I always come into the room initially with an open-ended question, meaning I ask most of my patients, and [K.T.] particularly, "Why are you here to see me?"

Q    What was her response, Doctor?

. . .

A    The patient told me she was here because her stepfather had kicked her a number of times and caused the bruises, and then she showed -- she pointed to her extremities and chest.

Q    Why was it important for you to know the cause of injury?

A    It is important to know the specific mechanism of injury to determine, for example, force and to determine further evaluation.   In this case I thought it was necessary to know the mechanism of injury to find out if I needed to order x-rays or not, and I determined that I did. So, the chest x-ray and left humerus x-rays were ordered.

The record demonstrates that K.T.'s statement identifying her perpetrator was made in connection with Dr. Bender's treatment of her and was of the type that is reasonably relied on by physicians in general when making diagnosis and treatment decisions.   The record further demonstrates that Dr. Bender gained the necessary information from which he concluded that X-rays were indeed required to determine the full extent of K.T.'s injury.   K.T.'s response to Dr.  Bender's question was a response such as is reasonably relied on by physicians in general and in this case resulted in the actual taking of X-rays.   We conclude that Dr. Bender's statements were admissible under the two-part test set forth in Harris.

We hold the District Court did not err in permitting Dr.

15

Bender to testify as to K.T.'s identification of Thompson as the perpetrator.

## III.

Was defendant denied his right to a speedy trial under the Montana and federal constitutions?

The right to a speedy trial in a criminal prosecution is a fundamental right that is guaranteed to the accused by the Sixth and Fourteenth Amendments to the United States Constitution and by Article II, Section 24 of the Montana Constitution. Thompson asserts that he has been denied this right by a delay of 203 days between his appearance before the justice court and his trial on the assault charge and that he is entitled to reversal of the conviction and dismissal of the charge. We disagree.

The test used to determine whether a defendant's constitutional right to a speedy trial has been violated was set forth in Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117. This Court adopted the Barker test in State ex rel. Briceno v. District Court (1977), 173 Mont. 516, 518, 568 P.2d 162, 163-64, stating:

> These cases involve a sensitive balancing of four factors, in which the conduct of the prosecution and the defendant are weighed in determining whether there has been a denial. of the right to a speedy trial.

The four factors to be balanced are (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. Barker, 407 U.S. at 530-32, 92 S.Ct. at 2192-93, 33 L.Ed.2d at 117-18.

### Length of delay

The first factor, the length of the delay, is of primary importance as the other three factors need not be considered unless the length of the delay is presumptively prejudicial. State v. Dahms (1992), 252 Mont. 1, 12, 825 P.2d 1214, 1220. Whether the length of delay will be considered presumptively prejudicial depends on the facts of each case. Dahms, 825 P.2d at 1220. The initial determination concerning the length of the delay is made without allocation of delay to either party. Dahms, 825 P.2d at 1220. A delay of over 200 days will usually trigger the full analysis. Dahms,. 825 P.2d at 1220-21.

In this case, 203 days is presumptively prejudicial to the defendant; thus, the remaining three factors must be considered. However, no particular factor is determinative; all four must be weighed in light of the facts and circumstances of the case. State v. Morris (1988), 230 Mont 311, 317, 749 P.2d 1379, 1382.

### Reasons for delay

In considering the second factor, the reasons for the delay, we allocate the delay by determining how much time is attributable to each party. State v. Heffernan (1991), 248 Mont. 67, 71, 809 P.2d 566, 568. In this case, the District Court set the trial date for the next term of court. The cause for the delay was purely institutional and is therefore chargeable to the State. State v. Hembd (1992), 254 Mont. 407, 413, 838 P.2d 412, 416.

However, institutional delay weighs less heavily against the State than does purposeful delay. Hembd, 838 P.2d at 416. As in Hembd, nothing in the record in this case points to any purposeful

17

delay by the State.

## Assertion of the right to a speedy trial

Thompson satisfied this element by moving to dismiss on speedy trial grounds prior to trial. However, he initially asserted his right to a speedy trial on November 5, 1992--just four days prior to trial. In denying Thompson's motion to dismiss on speedy trial grounds, the District Court noted that Thompson did not object to the trial date at the omnibus hearing when the date was set nor did he make any demand for a speedier trial. This was the normal method of scheduling criminal jury trials in Ravalli County. In the order dated November 9, 1992, the court further noted that three other district judges had since had criminal trial terms in Ravalli County, defense counsel had knowledge of the calendaring of criminal jury trials in Ravalli County and could have requested that one of the other district judges assume jurisdiction if defendant wanted a speedier trial. In State v. Mooney (1991), 248 Mont. 115, 119, 809 P.2d 591, 594, we said that a failure to object to a lack of a speedy trial until four days prior to trial showed a lack of actual interest in moving the case forward to trial and should be considered in balancing the Barker factors. We conclude that defendant's claim of the prompt assertion of his right to a speedy trial is both questionable and weak. Thompson's failure to object to a trial date at the omnibus hearing and his further failure to request trial at an earlier date by another judge must be considered as he asserts denial of a speedy trial.

## Prejudice to defendant

18

This Court has identified three factors which should be considered in determining prejudice: (1) pretrial incarceration; (2) anxiety and concern; and (3) impairment of defense. Hembd, 838 P.2d at 416. All are important but the most critical factor is impairment of the defense. Mooney, 809 P.2d at 595. Applying these factors to the record before us, we conclude that Thompson was not prejudiced by the delay.

Thompson was not incarcerated prior to trial. We have previously stated that a certain amount of anxiety and concern is inherent in being charged with a criminal defense and that the existence of anxiety or emotional distress is notoriously difficult to prove. State v. Curtis (1990), 241 Mont. 288, 303, 787 P.2d 306, 316. However, Thompson did not move for an earlier trial date and did not object to the date at the omnibus hearing. Moreover, nothing in the record indicates that the defense was impaired by the delay nor has Thompson alleged any such impairment. We conclude that Thompson was not prejudiced by the delay.

In sum, although the delay is properly attributable to the State, the 203-day delay was not unduly long under the circumstances of this case and the defendant has not shown that he was prejudiced. 'Thompson could have requested that the trial be moved forward. Further, Thompson waited until four days before trial to move for a dismissal based on a speedy trial; this appears to be a tactical ploy rather than a serious concern on his part. We conclude that the District Court did not err in denying Thompson's motion to dismiss on speedy trial grounds.

19

We hold defendant was not denied his right to a speedy trial under the Montana and federal constitutions.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

20

Justice Terry N. Trieweiler dissenting.

I dissent from that part of the majority opinion which concludes that the District Court did not err when it admitted statements made by defendant at his omnibus hearing, and when it instructed the jury on how to consider "admissions" and "confessions."

Nothing that defendant said at his May 26, 1992, omnibus hearing even remotely approaches an admission or a confession. In fact, he stated that he doubted he would be found guilty of having inflicted injury upon his daughter, but then argued that in the unlikely event that that occurred, the conduct of which he was accused was protected by the Constitution. His argument was not unlike arguments made by lawyers on behalf of their clients every day in both civil and criminal cases. It was a legal argument which asked the court to assume facts without admitting the truth of the facts alleged, but then requested the court to conclude that even assuming those facts to be true, they were legally insufficient.

"A confession is a direct acknowledgment of guilt on the part of the accused . . . ." *State v. Stevens* (1921), 60 Mont. 390, 402, 199 P. 256, 259. At no time during the omnibus hearing, or in the transcript that was read to the jury, did defendant acknowledge his guilt.

An admission has previously been defined by this Court as "a statement by the accused, direct or implied, of facts pertinent to

21

the issue, and tending, in connection with proof of other facts, to prove his guilt, but of itself is insufficient to authorize a conviction." *Stevens*, 60 Mont. at 402, 199 *P.* at 259; *see also State v. Hallam* (1978), 175 Mont. 492, 503, 575 P.2d 55, 62 ("[A]n 'admission' concerns only some specific fact which, in turn, tends to establish guilt or some element of the offense."); *State v. Goltz* (1982), 197 Mont. 361, 369, 642 P.2d 1079, 1084 ("An 'admission' is defined as 'an avowal or acknowledgment of a fact or of circumstances from which, together with other facts, guilt may be inferred."')

There is no fact admitted during defendant's entire dialogue with the court which infers that he assaulted his daughter. Therefore, the entire conversation was irrelevant to the issues the jury was being asked to decide and should not have been admitted.

In addition, assuming (again for the sake of argument) that the evidence was relevant, it should have been excluded under Rule 403, M.R.Evid. It had little, if any, probative value on the issue of whether the act defendant was accused of actually occurred, and it must have created great prejudice to let the jury know that defendant held such a bizarre religious view.

In fact, the prejudicial effect of this evidence is obvious from the arguments made by the prosecutor to the jury after the close of evidence. The prosecutor effectively exploited this prejudicial evidence when he argued that:

He doesn't think he can be prosecuted in this state for his use of force on a child based on a religious belief. Well, that is just not the law in Montana. Does your common sense tell you that that philosophy is what we should allow in the State?

Folks, this is a court of law, but you're supposed to keep your common sense when you come in here, and doesn't your common sense tell you that that kind of an attitude ends up with the kind of injuries that we saw on Karri Thompson?

I-low did this statement read? "Any action less than sacrifice would be merciful." Well, those pictures didn't look very merciful. Those pictures looked abusive, looked like an assault to me.

Later on in rebuttal argument, the prosecutor argued that:

Society cannot allow this Defendant, or anyone, to punish or abuse as he sees fit and then justify it on the basis of his religion or hiding behind the Bible, if you will.

It is clear from these arguments that once defendant's comments regarding the Bible and the Constitution were read to the jury, the focus of the prosecution was largely that defendant should be punished for his religious beliefs. The issue should have been limited to whether or not defendant committed the acts of which he was accused.

The District Court's error was compounded when it instructed the jury regarding the effect of not only admissions, but also confessions. In *State v. Starr* (1983), 204 Mont. 210, 217, 664 P.2d 893, 897, we stated that:

In determining whether to give an instruction, the inquiry of the District Court must only be whether any evidence exists in the record to warrant an instruction on the theory or issue submitted.

23

I concur with the defendant's position that, conversely, when no evidence exists to support a submitted instruction, the instruction should not be given.

In this case, nothing in the remarks of defendant, which are set forth in the majority opinion, can be construed as an admission. If his remarks did not amount to an admission, they certainly did not amount to a confession. To even imply to the jury that something defendant said could be construed as a confession was highly prejudicial to him.

I specially concur with the majority's conclusion that defendant was not denied his right to a speedy trial. However, I do not agree with everything that is said in that part of the opinion. Specifically, I do not agree with the majority's conclusion that the time at which defendant asserted his right to a speedy trial should be considered in balancing the *Barker* factors. Either he asserted his right in a timely fashion, or he did not. The majority concluded that he did assert his right in a timely fashion, and therefore, it should simply move on to the next consideration. It seems nonsensical to say that some assertions of the right to speedy trial can be timelier than other assertions. However, in spite of this disagreement with part three of the majority's **analysis,** I conclude that defendant was not denied his right to speedy trial based on a lack of evidence that he was prejudiced by the delay which occurred.

24

For these reasons, I would reverse the judgment of the District Court, I would exclude the transcript of defendant's remarks made at his omnibus hearing, and I would remand to the District Court for retrial without the excluded evidence or the prejudicial and irrelevant instructions which were given.

_____
Justice

Justice William E. Hunt, Sr., joins the foregoing dissent.

_____
Justice

Justice **Karla** M. Gray concurring in part and dissenting in part.

I join Justice Trieweiler's dissent on issue one in which he concludes that the District Court erred in permitting the jury to consider certain statements made by the defendant at the omnibus hearing and in instructing the jury regarding admissions and confessions. I also join in Justice Trieweiler's special concurrence on issue three regarding speedy trial. I dissent separately from the Court's opinion on issue two because it is my view that the District Court erred in permitting a medical doctor to testify as to the victim's identification of the perpetrator.

The Court relies on Rule 803(4), M.R.Evid., in concluding that Dr. Bender was entitled to repeat K.T.'s statement that her stepfather was the person who had kicked her. I agree with the Court that statements made to medical doctors for the purpose of medical diagnosis and treatment are admissible under Rule 803(4) as an exception to the hearsay rule when the declarant's motive in making the statement is consistent with seeking medical treatment **and** the statement is of a type reasonably relied on by a physician when making diagnosis and treatment decisions. I also agree that K.T.'s statement meets the first prong of this test because her motive in making the statement was consistent with seeking medical treatment.

I disagree, however, that the portion of K.T.'s statement in which she identified her stepfather as the person who had kicked her meets the second prong. The identity of the alleged perpetrator has nothing whatsoever to do with the doctor's need to

26

know how the injury came about.  The doctor does not rely in any way on the identity of the alleged perpetrator when making diagnosis and treatment decisions: only that portion of K.T.'s statement identifying the "mechanism" of the injury as repeated kicks is relevant. to diagnosis and treatment.  It is that portion of the statement which resulted in the taking of X-rays in this case and not, as the Court suggests, the portion in which she identified her stepfather as the person who had kicked her.

On that basis, I conclude that Dr. Bender should not have been permitted to testify as to K.T.'s identification of the perpetrator.  I would reverse the District Court on this issue.

_____
Justice