No. 95-018

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

STATE OF MONTANA,

      Plaintiff and Respondent,

    v.

ROBERT GOULD,

      Defendant and Appellant.

**FILED**

SEP 07 1995

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA


APPEAL FROM:   District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John McCarvel, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        Edmund F. Sheehy, Jr.; Cannon & Sheehy, Helena,
        Montana

    For Respondent:

        Hon. Joseph P. Mazurek, Attorney General,
        Barbara C. Harris, Ass't Attorney General,
        Helena, Montana

        Brant Light, County Attorney, Dean D. Chisholm,
        Deputy County Attorney, Great Falls, Montana


Submitted on Briefs: July 27, 1995

Decided: September 7, 1995

Filed:

_____
Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Robert Gould (Gould) appeals from the judgment and sentence entered by the Eighth Judicial District Court, Cascade County, on the jury verdict finding him guilty of the offense of sexual intercourse without consent. We affirm.

We restate the issues on appeal as follows:

1. Did the District Court err in denying Gould's motion to dismiss based on lack of speedy trial?

2. Did the District Court err in concluding that mental incapacity, as defined in § 45-2-101(35), MCA, includes voluntary intoxication and in denying Gould's motion to dismiss on that basis?

3. Did the District Court err in denying Gould's motion for a directed verdict of acquittal based on insufficiency of the evidence on the "without consent" element of the offense of sexual intercourse without consent?

4. Is there sufficient evidence to support the jury's guilty verdict on the offense of sexual intercourse without consent?

Disregarding minor discrepancies, the general facts in this case are not disputed. On the evening of February 5, 1992, Janetta Jo Paitra Clark (Clark), Tami Lynn Archer Horvath (Horvath), Russ Moddison (Moddison), Ian "Skip" Johnson (Johnson), Jordan Mattfeld (Mattfeld) and Gould met at the Black Eagle Country Club, in Black Eagle, Montana. The group drank and socialized at the club for

2

several hours.  Clark consumed approximately nine drinks.  The group left the club at approximately 1:00 a.m. on the morning of February 6, 1992.

After leaving the club, the group met at the residence of Mattfeld and Johnson.  At around 1:45 a.m., Mattfeld and Clark had a drinking contest in which they took turns drinking from a fifth of Jack Daniels.  Clark drank approximately one-half of the bottle.

After the contest, Clark stumbled into Mattfeld's room.  At one point, Clark fell and Mattfeld had to assist her in getting up. Clark collapsed onto Mattfeld's bed and, soon thereafter, Johnson and Moddison assisted her from Mattfeld's room to Johnson's room. They removed Clark's sweater and jeans, then stepped into the hallway where, together with Gould, they discussed having sex with Clark.  Moddison returned to Johnson's room; Johnson and Gould went to the living room.

Moddison removed Clark's bra and underwear and had vaginal and anal intercourse with her.  Johnson also had vaginal and anal intercourse with Clark.  Finally, Gould entered the room and had vaginal intercourse with Clark.  A few hours later, Moddison discovered Clark dead on Johnson's bed.

On April 13, 1993, the State of Montana (State) charged Gould by information with the felony offense of sexual intercourse without consent.  Gould's jury trial began on June 6, 1994, and the jury returned a guilty verdict on June 8, 1994.  Additional facts are set forth where necessary to our resolution of the issues.

1. Did the District Court err in denying Gould's motion to dismiss based on lack of speedy trial?

The Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee a criminal defendant the right to a speedy trial. Gould argues on appeal that the District Court erred in denying his motion to dismiss based on lack of speedy trial.

The State contends that Gould waived his right to a speedy trial and, as a result, that we should refuse to reach the merits of his argument. While it is true that Gould waived his right to a speedy trial on two occasions, first on September 14, 1993, and again on December 13, 1993, the record indicates that his waivers were limited to specific time periods. Therefore, the waivers did not constitute a total waiver by Gould of his speedy trial rights and we will address the waivers within our speedy trial analysis.

The United States Supreme Court set forth a four-factor test to be used in determining whether a defendant's right to a speedy trial has been violated in Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117; we adopted the Barker test in State ex rel. Briceno v. District Court (1977), 173 Mont. 516, 518, 568 P.2d 162, 163-64. The Barker factors are: (1) length of the delay; (2) reason for the delay; (3) defendant's assertion of the right; and (4) prejudice to the defendant. State v. Thompson (1993), 263 Mont. 17, 32, 865 P.2d, 1125, 1134 (citation omitted). None of these factors alone is dispositive; rather, they are considered together and balanced in light of the unique circumstances of each case. State v. Stewart (1994), 266

4

Mont. 525, 529, 881 P.2d 629, 632 (citations omitted).

*Length of Delay*

The length of the delay is of primary importance. State v. Heffernan (1991), 248 Mont. 67, 70, 809 P.2d 566, 568. Unless the length of the delay is presumptively prejudicial, it is unnecessary to consider the remaining three factors. State v. Weeks (Mont. 1995), 891 P.2d 477, 482, 52 St.Rep. 78, 81 (citation omitted). If a delay is presumptively prejudicial, the State has the burden of rebutting the presumption by providing a reasonable explanation for the delay and showing that the defendant was not prejudiced. State v. Curtis (1990), 241 Mont. 288, 299, 787 P.2d 306, 313 (citation omitted). We previously have stated that a delay greater than 200 days usually triggers a full speedy trial analysis. State v. Hembd (1992), 254 Mont. 407, 413, 838 P.2d 412, 416 (citation omitted).

Here, the total delay between the filing of the information and the commencement of Gould's trial was 419 days. Thus, the length of delay is presumptively prejudicial and we analyze the remaining speedy trial factors.

*Reason for Delay*

Analysis of the second factor, reason for the delay, requires allocating the delay to the party responsible for causing it. Heffernan, 809 P.2d at 568. The overall 419-day delay in this case can be divided into five segments.

The first segment, of 56 days, began when the State filed the information against Gould on April 13, 1993, and continued until June 8, 1993, when Gould successfully moved to continue the trial

5

set for June 21, 1993. This segment of the delay is attributable to the State.

The second segment, of 136 days, began on June 8, 1993, and continued until October 22, 1993, when the State successfully moved to continue the trial set for October 25, 1993. During this time, Gould successfully moved for three continuances and, in his September 14, 1993, motion, specifically waived his right to a speedy trial until October 11, 1993, when Dr. Donald Reay, an expert witness for the defense, would be available for trial. Additionally, he entered into, and then withdrew from, a plea agreement with the State. Upon withdrawing from the plea agreement, Gould informed the court he would be seeking new counsel.

Gould points out that the State amended the information against him during this period by dropping one of the charges. In fact, the State filed the amended information on July 26, 1993, subsequent to Gould's successful motion to continue. Gould argues that we should allocate the time from that date until October 22, 1993, to the State. However, the amended information did not impact the trial date set in response to Gould's July 26, 1993, motion to continue and did not require additional trial preparation by Gould; therefore, the State's filing of the amended information did not result in any delay. This 136-day segment of delay is attributable to Gould.

The third segment, of 34 days, began on October 22, 1993, and continued until November 24, 1993. The State's October 22, 1993,

6

motion to continue was due to Gould's failure to obtain counsel after his withdrawal from the plea agreement with the State. On November 18, 1993, upon motion by the State, Gould appeared in court and was ordered to retain counsel or proceed pro se by November 24, 1993. While this segment of delay arguably should be attributed to Gould on the basis that his unrepresented status undoubtedly prompted the State's October 22nd and November 18th motions, we attribute it to the State given the importance of the right to a speedy trial at issue here.

The fourth segment, of 106 days, began on November 24, 1993, and continued until March 11, 1994. Although ordered to retain counsel or proceed pro se by November 24, 1993, Gould did not appear with new counsel until December 13, 1993. Additionally, Gould requested that his trial be set no sooner than March 7, 1994, and in this request, he waived his right to a speedy trial for that time period. On March 11, 1994, the State successfully moved to continue the trial set for March 21, 1994. This segment of delay is attributable to Gould.

The fifth segment, of 87 days, began with the State's March 11, 1994, motion to continue the trial date, and concluded when Gould's trial began on June 6, 1994. During this period, the District Court, on its own initiative, continued the trial and set an omnibus hearing. This segment of delay is attributable to the State.

Gould is responsible for 242 days, while the State is responsible for 177 days, of the 419-day overall delay. The right

7

to a speedy trial was primarily designed to protect defendants from oppressive tactics by the prosecution. Heffernan, 809 P.2d at 569; citing Barker, 407 U.S. at 529. Gould does not contend, and the record does not reflect, that the State engaged in any deliberate tactics to delay the trial. The delay we attribute to the State was of the type which is inherent in the system and which we categorize as institutional delay. See Hembd, 838 P.2d at 416; Heffernan, 809 P.2d at 570. Institutional delay weighs less heavily against the State than purposeful delay. Hembd, 838 P.2d at 416 (citation omitted). Under the circumstances of this case, we conclude that the State has satisfied its burden of providing a reasonable explanation for the 177 days of delay attributed to it.

### Assertion of the Right

A motion to dismiss for denial of speedy trial is timely if made prior to the actual commencement of trial. Briceno, 568 P.2d at 165; citing State v. Steward (1975), 168 Mont. 385, 543 P.2d 178. Gould moved to dismiss the charges against him on speedy trial grounds on May 2, 1994, approximately one month prior to the scheduled trial date. Thus, Gould satisfied the third Barker factor by timely asserting his right.

### Prejudice to the Defendant

The fourth Barker factor is prejudice to the defendant. We assess prejudice by considering the following interests protected by the right to a speedy trial: (1) preventing oppressive pretrial incarceration; (2) minimizing the defendant's anxiety and concern; and (3) limiting the impairment of the defense. Curtis, 787 P.2d

8

at 315 (citations omitted).

Gould argues that he clearly has established the pretrial incarceration factor because he was incarcerated on this charge while awaiting trial. Gould's pretrial incarceration, however, does not weigh in his favor under the circumstances of this case.

On February 6, 1992, while awaiting sentencing on an unrelated offense, Gould committed the offense at issue in this case. He was sentenced on the unrelated offense to ten years' imprisonment, with five years suspended, approximately two and one-half weeks later and began serving his sentence at the Montana State Prison. On December 24, 1992, he was transferred to the Billings Pre-Release Center. In April, 1993, while at the Pre-Release Center, Gould was arrested for the offense at issue here. At that time, he obviously had not completed his sentence for the unrelated offense. On May 11, 1993, Gould successfully moved the District Court to allow him to remain incarcerated at the Cascade County Jail, rather than being returned to the Montana State Prison, because allowing him to remain in Cascade County would benefit him in preparing his defense.

It appears that Gould would have remained in the custody of the Montana Department of Corrections and, thus, incarcerated in some manner during the period in question. This Court previously has held that incarceration on a different charge negates any prejudice resulting from incarceration while awaiting trial. Hembd, 838 P.2d at 416. Under these circumstances, Gould's pretrial incarceration was neither oppressive nor prejudicial.

9

Gould argues that he suffered overwhelming anxiety and concern because of his lengthy incarceration. In this regard, we note that, as discussed above, Gould would have been in custody in any event; thus, anxiety and concern relating to the length of his incarceration are not specifically related to his incarceration on the offense at issue here. Gould also argues that he suffered from anxiety and concern due to the nature of the charge and the circumstances under which this offense occurred. Specifically, he contends that Clark's inability to testify caused additional anxiety and concern.

A certain amount of anxiety and concern is inherent in being charged with a crime. Thompson, 865 P.2d at 1135 (citation omitted). Proving anxiety and concern beyond that which normally accompany being charged with a crime is extremely difficult. See Curtis, 787 P.2d at 316. Once accomplished by a defendant, the State faces the nearly impossible task of proving lack of anxiety and concern. Curtis, 787 P.2d at 316. Where a defendant puts forth only marginal evidence of anxiety and concern, the State's burden of proving lack of anxiety lessens considerably. Curtis, 787 P.2d at 316.

In support of his claim of overwhelming anxiety and concern, Gould offers nothing more than bare assertions summarizing the circumstances in this case. He fails to present even marginal evidence proving that he suffered anxiety and concern beyond that inherent in being charged with this offense. We conclude that the minimal anxiety and concern Gould established did not exceed that

10

which is inherent in being charged with the offense at issue here and, therefore, this interest does not weigh heavily against the State.

The most important consideration in analyzing prejudice to a defendant resulting from pretrial delay is whether the delay impaired his defense. Stewart, 881 P.2d at 634. Gould argues that his defense was impaired because the time lag of more than two years between the alleged crime and the trial resulted in witnesses' memories fading.

It is clear that prejudice exists if defense witnesses are unable to accurately recall events of the distant past. See Heffernan, 809 P.2d 570; citing Barker, 407 U.S. at 532. Here, Gould was the only defense witness. His defense at trial was that Clark consented to intercourse with him. He remembered the details with regard to intercourse with Clark and testified that she consented. The record clearly shows that Gould was able to effectively, albeit unsuccessfully, present this defense.

Gould also argues that his defense was impaired due to the manner in which Moddison's and Johnson's charges were handled; Moddison pled guilty to sexual intercourse without consent and the charge against Johnson was dropped. It is unclear how this relates to the pretrial delay in this case. We conclude that Gould's defense was not impaired by the delay.

In summary, although Gould timely asserted his right to a speedy trial, his own actions delayed the trial for 242 days and the delay attributable to the State was institutional. Gould was

11

not prejudiced by the delay. After balancing the four Barker factors, we hold that the District Court did not err in denying Gould's motion to dismiss based on lack of a speedy trial.

2. Did the District Court err in concluding that mental incapacity, as defined in § 45-2-101(35), MCA, includes voluntary intoxication and in denying Gould's motion to dismiss on that basis?

At the close of the State's case, Gould moved to dismiss the charge against him as a matter of law. He argued that Clark's voluntary intoxication precluded the State from establishing that Clark was mentally incapacitated and, therefore, from proving the "without consent" element of the offense of sexual intercourse without consent. The District Court concluded that mental incapacity, as defined in § 45-2-101(35), MCA, is not limited to situations where the victim is involuntarily intoxicated and denied Gould's motion on that basis.

Our standard in reviewing a district court's conclusion of law is whether the interpretation of the law is correct. State v. Christensen (1994), 265 Mont. 374, 375-76, 877 P.2d 468, 469 (citation omitted).

The statutory definition of "without consent" insofar as it relates to the offense of sexual intercourse without consent encompasses the situation in which the victim is incapable of consent because she is mentally incapacitated. Section 45-5-501(1)(b)(i), MCA. Pursuant to § 45-2-101(35), MCA, a person is mentally incapacitated when she is "temporarily incapable of appreciating or controlling [her] own conduct as a result of the influence of an intoxicating substance." Gould argues that the

12

Montana legislature intended mental incapacity to have the same meaning under § 45-2-101(35), MCA, as it has under the New York law from which Montana's statute was adopted. Under New York Penal Law § 130.00(6) (1987), mental incapacity means:

> a person is rendered temporarily incapable of appraising or controlling his conduct owing to the influence of a narcotic or intoxicating substance **administered to him without his consent**, or to any other act committed upon him without his consent.

(Emphasis added.)

In interpreting a statute, we look first to the plain meaning of its words. Christensen, 877 P.2d at 469 (citation omitted). If the legislative intent can be ascertained from the plain meaning of the words used, no further interpretation is required and we will not resort to legislative history. Clarke v. Massey (Mont. 1995), 897 P.2d 1085, 1088, 52 St.Rep. 538, 540 (citation omitted). Where the language is plain, unambiguous, direct, and certain, the statute speaks for itself and there is no need to resort to extrinsic means of interpretation. Christensen, 877 P.2d at 469 (citation omitted). In addition,

> [i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted . . . .

Section 1-2-101, MCA.

Section 45-2-101(35), MCA, provides that a person is mentally incapacitated when, due to the influence of an intoxicating substance, she is temporarily incapable of appreciating or controlling her conduct. The statute by its terms does not differentiate between voluntary and involuntary intoxication and is

13

not limited to involuntary intoxication. Section 45-2-101(35), MCA, is clear on its face.

Moreover, while it is undisputed that Montana's mental incapacity statute was modeled after New York's, it also is clear that the Montana legislature did not adopt the New York law verbatim. *Compare* § 45-2-101(35), MCA, *with* N.Y. Penal Law § 130.00(6) (1987). The Montana legislature's deletion of the language from the New York statute which limits mental incapacity to situations where the victim is involuntarily intoxicated created a statute substantially different from that upon which our statute was modeled.

The District Court properly refused to insert into § 45-2-101(35), MCA, language from the New York penal statute omitted by the Montana legislature. We conclude that § 45-2-101(35), MCA, by its terms, does not exclude voluntary intoxication. Therefore, Clark's voluntary intoxication did not preclude the State from proving the "without consent" element of the offense of sexual intercourse without consent.

Gould further argues that there is a double standard in the law because people are responsible for their criminal acts despite their voluntary intoxication pursuant to § 45-2-203, MCA, while victims may be deemed incapable of consent when they are voluntarily intoxicated. He does not assert, however, that this alleged double standard infringes on any Constitutional right and, absent such a challenge, we must apply the statutes as written.

We conclude that the District Court did not err in

14

interpreting mental incapacity, as defined in § 45-2-101(35), MCA, to include voluntary intoxication. Therefore, we hold that the court properly denied Gould's motion to dismiss.

> 3. Did the District Court err in denying Gould's motion for a directed verdict of acquittal based on insufficiency of the evidence on the "without consent" element of the offense of sexual intercourse without consent?

In addition to his motion to dismiss as a matter of law based on statutory interpretation, Gould argued that the charge should be dismissed because the State's evidence of Clark's mental incapacitation and, therefore, of the "without consent" element of the offense, was insufficient to go to the jury. The District Court rejected this argument and refused to dismiss the charge.

Pursuant to § 46-16-403, MCA, a trial court may direct a verdict of acquittal and dismiss a criminal charge at the close of the State's case when the evidence is insufficient to support a guilty verdict. Our standard in reviewing a trial court's grant or denial of such a motion is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Weeks, 891 P.2d at 491-92 (citation omitted). Here, we focus only on evidence relating to mental incapacity.

The record illustrates that during the evening hours of February 5, 1992, and the early morning of February 6, 1992, Clark drank a substantial amount of alcohol. Dr. John Henneford testified that Clark's blood alcohol content reached at least .45. Clark's intoxication was uncontroverted. She ran into things as

15

she attempted to walk, fell and needed assistance in getting up, and had to be assisted to Johnson's room. A toxicologist opined that Clark was in the comatose-to-death phase of intoxication and explained that, at the comatose phase, a person becomes unresponsive to conditions around her.

Reviewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that Clark was mentally incapacitated due to intoxication and, thus, incapable of consent when Gould had intercourse with her. We hold that the District Court did not err in denying Gould's motion for a directed verdict of acquittal.

4. Is there sufficient evidence to support the jury's guilty verdict on the offense of sexual intercourse without consent?

Gould argues on appeal that the evidence established that Clark was dead when he had intercourse with her and, therefore, that there was insufficient evidence upon which the jury could find the "person" element of the offense of sexual intercourse without consent.

Our standard in reviewing the sufficiency of the evidence to support a criminal conviction is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Whitcher (1991), 248 Mont. 183, 187, 810 P.2d 751, 753 (citations omitted).

Gould testified that, when he entered Johnson's bedroom, he

16

asked Clark how it was going; she replied "all right."  He also testified that, after having intercourse with Clark, he returned to the living room around 2:30 to 2:45 a.m. and watched television. Dr. John Henneford, a pathologist, estimated that Clark died between 3:00 and 5:00 a.m., but opined that she probably died between 4:00 and 4:30 a.m.  James Bruckner, the Cascade County Deputy Coroner, also estimated the time of death to be between 4:00 and 4:30 a.m.

Reviewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence from which the jury could find that the State had proved the "person" element of the offense of sexual intercourse without consent beyond a reasonable doubt.  Therefore, we hold that sufficient evidence supported the jury's guilty verdict.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

17