No. 95-459

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

      Plaintiff and Respondent,

v.

GARY ATKINS,

      Defendant and Appellant.

FILED

JUN 25 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Ted L. Mimer, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

        Michael B. Grayson, Public Defender Project Office,
Anaconda, Montana

      For Respondent:

        Hon. Joseph P. Mazurek, Attorney General, John
Paulson, Assistant Attorney General, Helena,
Montana; Christopher G. Miller, Powell County
Attorney, Deer Lodge, Montana

Submitted on Briefs: April 4, 1996

Decided: June 25, 1996

Filed:

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court

A jury in the Third Judicial District Court, Powell County, found Gary Atkins (Atkins) guilty of one count of felony assault and one count of possession of a deadly weapon by an inmate. Atkins appeals the denial of his motion to dismiss for lack of a speedy trial, as well as the denial of his motion for a mistrial.

We affirm.

Atkins raises the following issues on appeal:

1. Did the District Court err by denying Atkins' motion to dismiss the charges because his constitutional right to a speedy trial allegedly had been violated?

2. Did the District Court err by denying Atkins' motion for a mistrial after "other crimes" evidence was introduced at trial?

Atkins is an inmate at the Montana State Prison at Deer Lodge. On December 1, 1994, the unit manager for a one of the housing facilities at the prison received information indicating Atkins might be in possession of a "shank," which is prison vernacular for a homemade weapon such as a knife. The unit manager directed two correctional officers to conduct a "shakedown" of Atkins--that is, to search him for weapons. The correctional officers stopped Atkins on his way back from lunch and took him into an office. They then informed him that the purpose of drawing him aside was to conduct a shakedown and told him to empty his pockets. Atkins became agitated and refused to empty his pockets or to allow the search. He kept one hand in his pocket and admitted that he was in fact in possession of a shank. He told the unarmed correctional

2

officers to stay away from him or he would stab one of them. At some point, he took the shank from his pocket--a sharpened piece of chain-link fencing with a handle made of tape--and either kept it in his hand (according to the officers) or set it on the desk and kept his hand right above it (according to Atkins).

Atkins asked to speak to the unit manager, who spoke to him briefly on the phone and informed Atkins that he would be right down.  The unit manager then picked up two more correctional officers who accompanied him to the office in question.  When these officers entered the office, the shank was on the desk but Atkins had his hand over it.  As the office became more crowded, one of the officers grabbed the shank off the desk while several others subdued Atkins.  He was then placed in handcuffs, advised of his rights, and taken to Maximum Security.

Because of the incident, Atkins was charged with one count of felony assault and one count' of possession of a deadly weapon by an inmate.  After trial, a jury found him guilty of both counts. Atkins appeals

### Issue 1

Did the District Court err by denying Atkins' motion to dismiss the charges because his constitutional right to a speedy trial allegedly had been violated?

Atkins was read his rights and transferred to Maximum Security immediately after the incident in question occurred on December 1, 1994.  On December 14, 1994, he was formally charged.  The trial began on June 26, 1995.  Two weeks previously, on June 11, Atkins moved that the charges be dismissed because he had not received a

speedy trial. The District Court denied the motion and Atkins appeals.

A defendant's right to a speedy trial is guaranteed by both the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution. The United States Supreme Court has set out a four-part test to determine whether a defendant's right to a speedy trial has been violated. Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101. This Court adopted the Barker test in State ex rel. Briceno v. District Court (1977), 173 Mont. 516, 568 P.2d 162.

Under the Barker test, when deciding a speedy trial issue the court must evaluate:

(1)  the length of the delay;
(2)  the reason for the delay;
(3)  the assertion of the right by the defendant; and
(4)  the prejudice to the defendant.

State v. Gould (1995), 273 Mont. 207, 214, 902 P.2d 532, 537; State v. Barker (1993), 261 Mont. 379, 382, 862 P.2d 1112, 1114.

First, if the length of delay is not long enough to be presumptively prejudicial, no speedy trial issue is triggered and a court need not consider the remaining three factors of the Barker test. If however, the delay is of such duration that it is presumptively prejudicial, the burden shifts to the State to rebut the presumption by providing a reasonable explanation of the delay and showing that the defendant was not prejudiced by it. Gould 902 P.2d at 537 (citing State v. Curtis (1990), 241 Mont. 288, 299, 787 P.2d 306, 313).

In its appellate brief, the State contends that the roughly ZOO-day delay in this case need not be presumed to be prejudicial. At trial, however, the county attorney informed the District Court that "the State concedes that the length of delay here is sufficient to require you to enter into the balancing test in Barker v. Wingo." Since the State conceded the point at trial, this Court will assume that the length of the delay in this case was long enough to be presumptively prejudicial.

The second factor in the speedy trial analysis is the reason for the delay. In this case, both parties concede that the delay was purely institutional. Neither party cultivated delay by moving for continuances or procedurally impeding the process of the case. Yet, given the trial calendar of the District Court, it took approximately 200 days to bring this **matter** to trial. Such institutional delay **must** be charged to the State. State v. Van Voast (1991), 247 Mont. 194, 201, 805 P.2d 1380, 1384. However, institutional delay weighs less heavily against the State than other kinds of delay because it is not a delay the State actively pursued or encouraged. Van Voast, 805 P.2d at 1384 (citing Curtis, 787 P.2d at 315).

Turning to the third factor, the State concedes that Atkins asserted his right to a speedy trial in a **timely** manner by moving to dismiss on speedy-trial grounds prior to trial. State v. Stewart (1994), 266 Mont. 525, 531, 881 P.2d 629, 633.

The fourth factor to be considered is the prejudice to the defendant. In deciding whether a defendant was prejudiced by a

5

delay, a court will assess the impact of the delay on the following interests, which are protected by the right to a speedy trial:

(1)   the preventionof oppressive pretrial incarceration;
(2)   the minimization of the defendant's anxiety and concern; and
(3)   the limitation of impairment of the defense.

Gould, 902 P.2d at 538; Barker, 862 P.2d at 1115.

It is undisputed that Atkins was incarcerated prior to trial. However, as an inmate serving an extended sentence, he would have remained incarcerated in any event. As this Court held in Gould, "incarceration on a different charge negates any prejudice resulting from incarceration while awaiting trial." Gould, 902 P.2d at 539 (citing State v. Hembd (1992), 254 Mont. 407, 413, 838 P.2d 412, 416). Nor did Atkins exhibit notable anxiety and concern regarding the disposition of the charges. He testified that he was inconvenienced by the charges in that he decided not to begin taking certain classes at the Prison until the charges were resolved, because a finding of guilt meant he would have to abandon the classes. His concerns focused on the fact that, in his opinion, his ability to go to school depended on an ultimate resolution of the charges, although he was not in fact precluded from enrolling in classes.

The record reflects that Atkins did not assert that he had suffered any increased anxiety during the pendency of the charges. While anxiety or distress are difficult to prove, it is nearly impossible for the State to prove such emotional states do not exist. Consequently, we have held that "the State's burden to show a lack of anxiety becomes considerably lighter in the absence of

6

more than marginal evidence of anxiety." Curtis, 787 P.2d at 316. In this case, the record shows no evidence whatsoever of anxiety or undue concern.

Atkins, however, argues that his ability to defend the charges was impaired because one of his potential witnesses disappeared prior to trial. Atkins wanted to subpoena a teacher from the prison, whom he asserts would have testified regarding Atkins' apprehension that another inmate would attack him. This in turn would corroborate Atkins' explanation of why he made and carried the shank. The teacher in question disappeared while the trial was pending, and Atkins was unable to subpoena him. Atkins asserts that his inability to have this teacher testify seriously prejudiced his defense. The burden remains on the State to show that Atkins was not in fact prejudiced by the teacher's failure to testify.

At the hearing on his motion to dismiss, Atkins' testified that he had spoken to two teachers, one male and one female, regarding his apprehension about the other inmate. He testified, however, that he had told the female teacher, who testified at trial, "a little less" than he told the male teacher, who is missing, "because I got along with him better and I trusted him more."

Atkins planned on using the missing teacher's testimony to substantiate his own apprehension in an attempt to justify possession of the shank. The State points out that Atkins, without objection, was allowed to testify to the substance of his

7

conversation with the missing teacher. He further testified to the conversation he had with the female teacher, and this was in turn corroborated by her testimony. Thus, the jury heard uncontroverted evidence that he had conveyed his concerns to both teachers.

Even if the missing teacher had testified, he could only have confirmed the validity of Atkins' representations regarding the substance of their conversation. In fact, however, the State never challenged the validity of Atkins' testimony. The teacher's testimony, therefore, would have been cumulative and repetitive of Atkins' own testimony. The State has shown that the evidence which the teacher would have presented was in fact presented by Atkins himself, without objection. It has therefore demonstrated that the presentation of Atkins' defense was not impaired by the teacher's absence.

If a speedy trial inquiry is triggered, the State must either show a reasonable excuse for the delay or show that the defendant was not prejudiced thereby. State v. Mooney (1991), 248 Mont. 115, 118, 809 P.2d 591, 594 (citing State v. Ackley (1982), 201 Mont. 252, 653 P.2d 851). In this case, the State has shown that the delay was purely institutional and not prejudicial to Atkins' defense. The District Court did not err by refusing to dismiss the charges based on lack of a speedy trial.

## Issue 2

Did the District Court err by denying Atkins' motion for a mistrial after "other crimes" evidence was introduced at trial?

During the confrontation in the prison office, a correctional officer tried to persuade Atkins to surrender the shank, noting

8

that there could be serious consequences if he refused. According to the officer, Atkins replied that "he was doing time for two homicides and he wouldn't be eligible for parole until he was 75, [sol he didn't care." Before trial, the defense moved in limine to exclude evidence of any **crimes** other than the ones at issue in this case. The State agreed not to present any "other **crimes"** evidence, provided the defense would stipulate that Atkins was an inmate.

During direct examination at trial, however, the correctional officer related the substance of Atkins' comment before the jury. Defense counsel immediately objected, and the District Court admonished the jury to disregard the correctional officer's comment. Defense counsel then moved for a mistrial, which motion the District Court denied. Before deliberations, the jury was also provided with a jury instruction again admonishing them not to consider any other crimes but those for which Atkins was currently on trial. On appeal, Atkins asserts that the District Court abused its discretion by denying his motion for a mistrial. He contends that the officer's comments were so prejudicial the District Court's admonishment and jury instruction could not sufficiently cure the error.

The standard of review for denial of a motion for mistrial is whether there is clear and convincing evidence that the trial court's ruling was erroneous. State v. Greytak (1993), 262 Mont. **401, 404, 865** P.2d 1096, 1098 (citing State v. Benton (1992), 251 Mont. 401, 404, 825 P.2d 565, 567-68). A district court properly grants a motion for **a mistrial** only when a manifest necessity

9

exists to do so.    Greytak, 865 P.2d at 1098; State v. seaman (1989), 236 Mont. 466, 475, 771 P.2d 950, 956.

In this case, the correctional officer's reference to Atkins' criminal record surprised the State as well as the defense.   Atkins does not allege that the State purposely elicited the testimony, but, nevertheless, the jury heard it. Atkins asserts that the fact that the jury heard this testimony is reversible error because the comment was so prejudicial that "[a] jury could not and will not forget or disregard [it-l ." He speculates that the jury disregarded both the District Court's admonishment and the specific jury instruction.   Speculation, however, is not the clear and convincing evidence necessary to reverse a district court's denial of a motion for a mistrial.

In any event, any declaration, act, or omission which itself forms part of the transaction in dispute is admissible.   Section 26-1-103, MCA. As we held in State v. Wing (1994), 264 Mont. 215, 224, 870 P.2d 1368, 1375, "[w]hether an act is referred to as part of the res gestae or as part of the 'transaction,' that act is evidence which is part of the same litigated event."   In this case, Atkins' reference to his existing sentence took place during the short stand-off in the prison office.   It explained why he was indifferent to the consequences of his actions and why he would not peacefully surrender.   Evidence which is closely related to and explanatory of the offense may be admissible.   Wing, 870 P.2d at 1374 (citing State v. Cameron (1992), 255 Mont. 14, 20, 839 P.2d 1281, 1285). Accordingly, even if the jury considered the disputed

10

evidence despite the District Court's admonishment and jury instruction not to do so, such consideration is not reversible error.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

11